Nott, J.,
delivered the opinion of the court:
This case involves three questions of constitutional law.
The jurisdiction of the court is derived from a special act of Congress, and the defendants contend that the statute is unconstitutional and void.
The first objection goes to the President’s approval of the act and raises the question whether the bill ever became a law. It originated in the Senate and passed the House of Representatives on the 14th December, 1892. On the 15th it was signed by the Speaker and the President of the Senate.
*526 On the 20th it was laid before the President. The ten days (Sundays excepted) within which he might sign or return it to Congress, therefore, expired on the 31st December.
While the bill was still in the hands of the President Congress adjourned for the usual holiday recess. The joint resolution of adjournment is as follows:
“ Resolved by the Rouse of Representatives (the Senate concurring), That when the two Houses adjourn on Thursday, December 22, they will stand adjourned until Wednesday, January 4,1893.”.
On the 28th December, 1892, neither of the Houses of Congress then being in session, the President signed the bill.
The provisions of the Constitution relating to the duty and power of the President are in these words:
“ Every bill which shall have passed the House of Representatives and the Senate, shall, before it become a law, be presented to the President of the United States ; if he approve he shall sign it, but if not he shall return it, with his objections, to that House in which it shall have originated, who shall enter the objections at large on their journal, and proceed to reconsider it. If after such reconsideration two-thirds of that House shall agree to pass the bill, it shall be sent, together with the objections, to the other House, by which it shall likewise be reconsidered, and if approved by two-thirds of that House, it shall become a law. But in all such cases the votes of both Houses shall be determined by yeas and nays, and the names of the persons voting for and against the bill shall be entered on the journal of each House, respectively. If any bill shall not be returned by the President within ten days (Sundays excepted) after it shall have been presented to him, the same shall be a law, in like manner as if he had signed it, unless the Congress by their adjournment prevent its return, in which case it shall not be a law.”
The position of the counsel for the respondents is this:
“No power exists on the part of the Executive to approve a bill after the .adjournment of the two Houses of Congress, and the approval of a bill passed by the two Houses of Congress is a legislative function, the President being for that purpose a component part of the lawmaking power, and it being only when Congress are in session that a legislative act can be performed.”
In support of this position it is said that “ in our whole history of legislation there is but one act, the act of 12th March, 1863, which has been approved after the adjournment of Congress;” and it is contended, concerning this single, exceptional *527 statute that, as the question of its constitutionality was never brought to the attention of the Supreme Court, it can not be regarded as authority for the existence of the power of approval in the President after an adjournment of Congress.
After a prolonged and careful examination of the history of the Abandoned and Oaptn.red Property Act, 12th March, 1863 (12 Stat. L., p. 820), the court is now constrained to say that the history of the sta tute is decisive of the question, and that it demonstrates that the three departments of the Government, the executive, the legislative, and the judicial, have so concurrently affirmed, the constitutionality of the act that the authority of the President to approve a bill within the time prescribed by the Constitution, but after the expiration of the Congress which passed it, must be regarded as now settled.
The abandoned and captured property act, from the immense and extraordinary litigation which followed it, is generally supposed to have been little more than an act to confer a new subject of jurisdiction upon this court. In fact, it was a statute of great importance and significance, which created a new kind of property unknown to international law; property, in the words of the Supreme Court, of “ a peculiar description known only in the recent war, called captured and abandoned property” (Klein? s Case, 13 Wall. B., 128), and which aggregated probably in value upwards of $50,000,000. It held out terms and assurances to the loyal people of the South; it imposed new and complicated duties upon the Secretary of the Treasury,- it authorized the appointment of a great number of special agents; it prescribed the manner in which this property should be collected and sold; it authorized the confiscation of other property; it declared certain acts to be misdemeanors, and imposed severe penalties and pimishments upon the persons offending; it prescribed new duties for officers in the Army and Navy, and directed that those who neglected to carry out its provisions should be court-martialed and suffer the severest of military punishments.
All that relates to the jurisdiction and duties of this court and to the rights and disabilities of the owners of the captured property are to be found in nine lines of a section primarily relating to the bonds and books of account of the agents of the Treasury. In a word, it was a statute which required the careful consideration before approval of the President, of the Secretary *528 of tbe Treasury, tbe Secretary of War, and tlie Secretary of tbe jNavy. Probably tbe three most important statutes enacted during tbe civil war were tbe confiscation act, tbe commercial intercourse act, and tbe abandoned or captured property act.
If tbe action of the President bad passed unnoticed, except as tbe eyes of individual members of Congress chanced to fall upon tbe date of bis approval, no great significance could be attached to either legislative action or inaction. But on tbe 10th May, 1804, tbe subject of tbe approval having been brought to tbe attention of tbe House of Representatives, tbe House ordered its Committee on tbe Judiciary to inquire and report “by what warrant or authority tbe act was approved on the 12th March, 18(13, and whether said act is in forced On tbe 11th June, 1804, tbe committee reported, and the report was unanimous. As this is of great import and not easily accessible, it is now set forth in extenso.
“ Mr. Wilson, from the Committee on the Judiciary, made the following report:
“ Tbe Committee on the Judiciary, to whom was referred tbe subject of tbe approval of tbe act of March 12, 1803, report: “
“ By resolution of the House of May 16,1864, it was ordered, ‘That the Committee on the Judiciary be instructed to inquire and report to the House by what warrant or authority tbe act entitled ‘An act to provide for the collection of abandoned property and for tbe prevention of frauds in insurrectionary districts within tbe United States/ was approved on the 12th day of March, 1863, and whether said act is in force.’ u
u On the reception of this resolution tbe committee caused a note to be addressed to the Secretary of State asking to be informed whether, as a matter,of fact, it appeared on the original files in tbe State Department that tbe act referred to was approved on tbe 12th day of March, 1863. In reply to this note the Secretary of State responded that tbe original act is to all appearances regular in every respect of form. As to tbe date of its approval, that of the 32th day of March, 1863, the words and figures ‘Approved March 12,1863/ are in the bandwriting of the President and followed by his signature. Thus it appears from tbe original files in tbe State Department that such act was approved March 12, 1863, and this is true in fact as to the date of the approval.
“ The section of th¿ Constitution of the United States bearing upon this question reads as follows:
“ ‘ If any bill shall not be returned by tbe President within ten days, Sundays excepted, after it shall have been presented to him, tbe same shall be a law in like manner as if he had *529 signed it, unless Congress by their adjournment prevent its return ; in which case it shall not be a ¡Law.’
“The committee are informed that in the great press of business immediately preceding the adjournment of Congress on the 4th of March, 1863, the act' which is made the subject-matter of inquiry by the resolution of the House was passed to the Secretary of the Treasury, for examination, as it related particular^ to his Department. It didnotreach the President again until after the adjournment of Congress, when it was approved by him under the belief that the hmt clause of the section of the Constitution above quoted was designed more especially to prevent Congress from enacting laws without the approval of the Executive, which might be done by thepassage. of bills by the two Houses, followed by an adjournment, before the President could examine and return them, were it not for the declaration that in such cases the bills shall not be laws, and did not relate to cases wherein the Executive should approve bills sent to him by Congress within ten days, even though an adjournment should occur before the return of the bills. That there is force and plausibility in this position a little reflection will discover to any mind, but the committee can not receive it as a correct interpretation of the Constitution.
“The ten days’ limitation contained in the section above quoted refers to the time during which Congress remains in session, and has no application after adjournment.
“Hence, if the Executive can hold a bill ten days after adjournment and then approve it, he can as well hold it ten months before approval. This would render the laws of the country too uncertain, and could not have been intended by the framers of the Constitution. The spirit of the Constitution evidently requires the performance of every act necessary to the enactment and approval of laws tobe perfect before the adjournment of Congress.
“ The committee therefore conclude that the act referred to, approved March 12,1863, is not in force, and in this conclusion the committee are unanimous.”
The report was ordered to be printed and referred to the Committee on Ways and Means. So far as is now known to the court it was never again acted upon.
The inaction of Congress with a report of this significance before them would ordinarily indicate, negatively, that a majority of the members did not agree with the Committee on the Judiciary. But there is positive evidence of the legislative judgment.
While the members of the Judiciary Committee were considering the subject of their report there waspending in the Senate a bill which ultimately became the Act in Addition to the *530 several acts concerning commercial intercourse between loyal and insurrectionary States, and to provide for the collection of captured and abandoned property, etc., 2d July, 1804 (13 Stat. L., p. 375). On the 28th May, 1804, this bill was reported to the Senate; on the 28th Jnne it passed the Senate and went to the House. In the House a slight amendment was made, and on the 2d July it passed both Houses. Not only did Congress entitle this statute an act in addition to the abandoned or captured property act, but the first section expressly declares, “ That sales of captured and abandoned property under the act approved March 12,1803, may be made at such places as may be designated by the Secretary of the Treasury.”
At the time when this act in addition was being considered in Congress, the jurisdictional period prescribed by the abandoned and captured property act for bringing suits against the United States had not yet begun; no money derived from captured property had yet been covered into the Treasury; and with the exceptions of the declaration to Southern Unionists and the appointment of Treasury agents the whole subject was as completely within the control of Congress as if the abandoned and captured property act had never been passed. If Congress agreed with the Judiciary Committee of the House in deeming the act to be unconstitutional and void, all that was then needed to cure the defect was a single clause in the act in addition, reenacting the previous statute and validating proceedings under it. That clause was not inserted.
And at this same time when the act in addition was passing through the Thirty-eighth Congress another bill was likewise being considered which became the Act to restrict the jurisdiction of the Court of Claims, 4th July, 1864 (13 Stat. L., p. 381). This statute inhibited the court from the exercise of jurisdiction over claims for property ‘‘appropriated” by the Army or Navy, but left the jurisdiction over claims for captured property unimpaired. Subsequent Congresses in like manner recognized the constitutionality of the act. The Thirty-ninth Congress referred to the “ act approved March 12,1863,” and legislated for official acts done “under authority or color of the act.” (14 Stat. L., p. 328, sec. 8.) TheFortieth Congress again referred to the act “approved March 12,1863,” and repeated the questionable date of approval in two sections of the statute (15 *531 Stat. L., p. 243). The same Congress also passed a joint resolution directing that the moneys collected under the act be covered into the Treasury (15 id., p. 251). The Forty-first Congress came to the aid of the defendants, the United States, in suits under the act, and made the most stringent regulations adverse to the claimants’'right of recovery. The Forty-third Congress incorporated it in the Revised Statutes (sections 1059, 3689). In a word, Congress at various times, by public and' private acts extending from the Act in Addition 2d July, 1864, to the Act 4th June, 1888 (25 Stat. L., p. 1075), conferring upon the court the same jurisdiction which was “given to said court by the acts of March 12, 1863, and Juiy 2,1864,” have recognized the constitutionality of the abandoned or captured property act. '
Bearing in mind the facts that the act of July 2,1864, is by its title proclaimed to be “an act in addition” to an existing statute ; that its enactments recognize and enlarge the provisions of the previous act; that it was enacted by the same Congress which had come into existence when the abandoned and captured property act was approved ; that it passed through both Houses of Congress soon after the report of the Judiciary Committee had been made and printed; that repeated enactments extending over a period of twenty-one years have affirmed and reaffirmed by necessary implication the constitutional existence of this suspected statute, naming it in almost every instance by the date of its approval, it must be confessed that probably there is not another act of Congress in the statute books which has been so repeatedly and so significantly recognized by the legislative branch of the G-overnment as being one of the laws of the United States.
We now come to the judicial branch of the Government.
When the first case involving the constitutional existence of the abandoned and captured property act came before the Supreme Court the Secretary of the Treasury, who had examined the bill before the President approved it, and who more than any man in the world, except President Lincoln, had been cognizant of the fact that it was not approved until after the expiration of the Thirty-seventh Congress, had become Chief Justice of the United States. As an individual he knew every-' thing connected with the approval of, the bill which it was *532 possible for man to know, and as a judge it was bis duty not to determine the legal rights of suitors by the terms of something purporting to be a statute if well-grounded judicial doubts existed as to the constitutionality of the act — whether indeed the statute which he was to administer as law had ever become a law of the United States. Only two years had then elapsed since the bill was approved; less than a year since the House of Bepresentatives had ordered the Judiciary Committee to inquire “ by what warrant the act was approved;” only nine months since the committee had reported that the approval was unconstitutional and the act “not in force.”
The unprecedented fact that the President had approved a bill after the expiration of the Congress which passed it was fresh in his mind and undoubtedly known, apart from the date at the foot of the statute, to every judge upon the bench. On the 10th March, 1865, the Supreme Court decided this case, the Chief Justice delivering the opinion of the court and twice citing the act by its date, and resting upon it two important conclusions: that in the existing war, the capture of private property on land was “ warranted by law;” that land captures by the Navy were not a subject of maritime prize, but must be “turned over to the agents of the Treasury Department, to be disposed of under the act of March 12, 1863. ” (Mrs. Alexanders Cotton, 2 Wallace R., 404, 423.)
It may be thought that the Supreme Court never considered the question of constitutionality (notwithstanding the fact that the badge of unconstitutionality was stamped upon the face of the statute) because the point was never raised by any party litigant and the question never so presented to the court as to render its decision essential in the determination of a case. Undoubtedly there are instances where statutory provisions elude the attention of judges, and undoubtedly it is considered the part of judicial wisdom not to determine points which are not raised by counsel and made plain by argument; but there are some questions which are always before a court, questions which a court is bound to notice and bound to decide; and among these is the question of its own jurisdiction. Consent can not confer jurisdiction; the silence of parties does not justify a court in keeping silent.
The jurisdictional period for bringing suits under the abandoned or captured property act began in August, 1866. The *533 first cases came to trial in June, 1867. For some time it was generally supposed that no appeal would lie to the Supreme Court. In 1869 a claimant presented bis application for an appeal, but this court refused to send up the record, a majority of the judges holding that as the statute provided that a loyal owner of captured property should be paid the proceeds in the Treasury “on proof to the satisfaction of the said court,” it followed that the jurisdiction of “said court,” the Court of Claims, was exclusive and final, and consequently that the Supreme Court was without jurisdiction to entertain an appeal. The party applied to the Supreme Court for assistance and the question was considered upon an application for a mandamus. The Supreme Court then had to consider the question of its own jurisdiction. If the statute was constitutional and operative, the court might or might not be authorized to entertain appeals; if it was unconstitutional and void the court was certainly without power in the premises.
Only five years before this, and after Chief Justice Chase had come upon the bench, the Supreme Court had done that very thing. In a case before the court neither party had challenged the appellate jurisdiction or questioned the constitutionality of another statute. Both sides indeed had desired that the statute should be deemed constitutional and filed arguments upholding the jurisdiction. But the court on its own motion considered the question of constitutionality and held the statute to be in excess of legislative authority and declined to entertain jurisdiction of cases coming under it; and the opinion of the court was delivered by the Chief Justice (Gordon’s Case, 2 Wallace, 561. But see 7 C. Cls. R., 1, where the opinion of the Chief Justice is given.)
The opinion of the Supreme Court upon the right of appeal in captured property cases was delivered by one of the most experienced, careful, and conservative judges that ever sat upon the American bench, then in the forty-seventh year of his judicial service, and of whom it may be said that nothing ever escaped his judicial eye. The opinion shows that with accustomed care and caution he looked into the history of the statute and knew perfectly that the bill had passed during the last days of the Thirty-seventh Congress, and that another act, which conferred jurisdiction on the court, had passed at the same time and been approved, according to usage, on the 3d *534 of March. Nothing can be plainer than that the judges then had before them two essential facts — that the bill was passed by the Thirty-seventh Congress; that it was approved after the Thirty-seventh Congress had expired; and nothing can be plainer than that with those two facts before them they were then to determine whether the court had jurisdiction of cases resting wholly upon the constitutionality of the act.
Mr. Justice Nelson, in his opinion, first refers to the Act 3d March, 1863 (12 Stat. L., p. 765), which conferred judicial power on this court to render judgments against the Government and which authorized appeals therefrom to the Supreme Court. He then proceeds to consider the abandoned or captured property act, on which, as has been said, the case before the court rested wholly. His language is significant and conclusive :
“The act providing for the collection of abandoned property in insurrectionary districts, passed March 3,1S63, under which the property in question was seized, provided, in the third section, that 1 any person claiming to have been the owner of any such abandoned or captured property may, at any time within two years after the suppression of the rebellion, prefer his claim to the proceeds thereof in the Court of Claims; and on proof to the satisfaction of the said court, of the ownership of said property, of his right to the proceeds thereof, and that lie has never given any aid or comfort to the present rebellion, to receive the residue of proceeds, after deducting expenses,’ etc. This act contains no provision for an appeal from the judgments or decrees of the court. It was passed by Congress on the same day that the act of 3d March, 1863, above referred to, was passed, reorganizing the Court of Claims, and authorizing it to render judgments against the Government, with the right of either party to appeal to the Supreme Court, as already stated, though it was Not approved by the President till nine days aeter.war.ds. The motion for a peremptory mandamus is granted.”
In re Zellner, ex parte, 7 C. Cls. R., 137, where the full text of the opinion is given.
At the same time, and indeed on the same day, that this decision was made the case of Welson Anderson (9 Wallace, 56) was likewise decided. It also related to rights acquired under the abandoned or captured property act, and the opinion contained the first construction given to the statute.' The Supreme Court held that the act “inaugurated a policy different from *535 that which induced the passage of other measures;” that “by the act in question the Government yielded its right to seize and condemn the property which it took in the enemy’s country,” and that the court below was “authorized to render judgment for a specific sum.” But the chief significance of the decision is to be derived from these facts: That the two cases were held under advisement at the same time; that the importance of the decision in Zellner was made known to the Supreme Court by the importance of the points determined in Anderson, and that the whole subject of the judicial construction which should be given to the act was concurrently considered and determined by two such jurists as Samuel Nelson and David Davis.
There remains another case which is even more significant.
In 1870 Congress enacted, by means of a proviso to an appropriation bill (Act 12th July, 1870, 16 Stat. L., p. 235), “That whenever any pardon shall have heretofore been granted by the President of the United States to any person bringing suit in the Court of Claims for the proceeds of abandoned or captured property under the said act approved March 12,1863,” “ the court shall forthwith dismiss the suit of such claimant.” There were other provisions in the statute, and among them one which provided that the proof of loyalty required by the act March 12,1863, should be “irrespective of the effect of any Executive proclamation, pardon, amnesty, or other act of con-donation or oblivion.”
In 1871 a suit came before the Supreme Court where judgment to a large amount had been rendered by the Court of Claims in favor of the claimant for the proceeds of captured property. It appeared by the record that the claimant had' been guilty of an act of aid and comfort to the rebellion. It appeared also that he had taken the oath of amnesty and allegiance and came within the operation of the President’s proclamation, 17th July, 1862. The Attorney-General relied upon the act of 1870. The counsel for the claimant maintained that the act of 1870 was unconstitutional and void.
If the claimant had any constitutional right to assert, that right rested wholly upon the abandoned and captured property act. The Supreme Court decided that he had; that the title to his property was not divested by capture and was still vested *536 in him. The question then recurred whether the act of 1870 was unconstitutional and void; whether it deprived the claimant of his constitutional right to be heard in a suit brought according to law — the law of the abandoned and captured property act — to recover the proceeds of his property.
Here, then, was a case of statute against statute, of constitutionality against constitutionality; of the court being invoked to declare a statute unconstitutional beoause it impaired rights given by a statute which was unconstitutional upon its face.
The act of 1870 was held to be unconstitutional; necessarily, though not in terms, because the other act was constitutional— that is to say, the act of 1870 was held to be unconstitutional because it took away constitutional rights vested in the claimant by the act of 12th March, 1863. It is utterly inconceivable that any intelligent court, that jurists of such breadth of understanding as the judges of the Supreme Court, could have thus had the subject of the unconstitutionality of'an act of Congress before them and have decreed that it was absolutely void because of the existence of another statute which was void upon its face.
Furthermore, Mr. Justice Miller dissented from the opinion of the court, not in toio, but on one important point. “I have not been able,” he said, “to bring my mind to concur in the proposition that under the act concerning captured and abandoned property, there remains in the former owner, who had given aid and comfort to the rebellion, any interest whatever in the property or its proceeds.” All that Mr. Justice Miller had to say was, “the abandoned or captured property act is uncon stitutional and void,” and if it could have been maintained the whole fabric of the decision would have been shattered. He did not say so, but conceded that the act was a law of the United States. United States v. Klein, 13 Wall. R., 128.
It is now apparent that the act was subjected to the severest scrutiny in cases involving questions of constitutionality, questions of jurisdiction, and questions of the repeal, by implication, of other statutes, by Chief Justice Chase, Mr. Justice iSTelson, Mr. Justice Davis, andMr. Justice Miller. If the judicial scrutiny of four such judges did not detect the unconstitutionality of this statute it must seem as if learning and ability and training and sagacity are valueless in discharging the duties of the judicial office.
*537 We have said of this statute that “probably there is not another act of Congress in the statute books which has been so repeatedly and so significantly recognized by the legislative branch of the Government as being one of the laws of the United States.” It must now be added that probably there is not another instance in the reports where a statute has come before the Supreme Court in so many ways, and been examined from so many and such diverse points of view, and received from so many of the most eminent judges of the country such extraordinary judicial recognition.*
It should also be noted that this act opened a new field of litigation — a litigation of no ordinary character, presenting questions whicli had never been presented to a court before and involving large amounts. More than fifty cases appear • to have been carried to the Supreme Court and decided there. Nearly sixteen hundred suits were brought in this court; nearly $10,000,000 was recovered from the Treasury. The United States were represented by many and eminent counsel, one of whom had been a Senator when the act was passed. The law officers of the Government changed from time to time, new legal ability coming to its support. Defenses of extraordinary ingenuity were interposed, so that it seemed at the time that the ability of the American bar could do no more to defend the Treasury thau was done. The personnel of the courts also changed, judges coming on the bench with minds unprejudiced by previous proceedings and able to apprehend and advance new ideas. Congress also interposed to support the defenses of the Government. Million after million was paid by successive Secretaries of the Treasury. The accounting officers *538 asserted powers over the judgments in these cases which the Supreme Court examined and overruled. It indeed seems incontrovertible that every department of the Government for more than twenty years was alert to defend the United States in the matter of these eaptured-property suits, and yet that not one person ever asserted that the act was unconstitutional and void.
We come now to the Constitution itself — to its purpose, terms, and history, and consequently to the question whether the unuttered conclusion of the Supreme Court was in all likelihood a judicial inadvertence, or was well founded in the plain meaning of the great instrument and the well-considered intention of its framers.
The Constitution declares (in the event of an adjournment) that a bill shall not become a law if the President does not sign it. It does not declare that a bill shall not become a law though he does sign it. The Constitution provides for a contingency, which contingency is the nonapproval of an act after the adjournment of Congress. It declares what shall liai)pen in the case of nonapproval; it does not declare that the same thing shall happen in the case of approval. There is neither restriction nor implication that a bill shall not become a law if the President does sign it. The theory that the approval of a bill by the President is void, though it be given within the time prescribed by the Constitution, rests wholly on this idea — that the authority to approve and disapprove hills is legislation; in the words of Kent, “ a weapon to defend the executive department against usurpations of legislative power;” in the words of Story, a power “to negative'laws.”
This indeed is the only substantial reason that has ever been given for requiring the President to approve a bill during the actual sitting of Congress. The idea doubtless was suggested by the British constitution as it once existed, and the fact that the President as Chief Executive of the nation bears some resemblance to a king and is possessed in a limited degree of one of the attributes of sovereignty. But the reason isnot founded in fact; the premises do not support the conclusion.
Under the historic British constitution as it once existed, the power of the Crown in matters of legislation was, negatively, absolute. The enactment of a statute required the assent of the three estates of the realm, of the House of Commons, of *539 the House of Lords, of the Crown. The nonconcurrence of any one of them was as fatal as the nonconcurrence of either of the others. Hence the Crown was properly classed by English, lawyers as a part of Parliament, as a part of legislative power.
Under the American Constitution the assent of the President is not essential to the enactment of a single law. His authority over an act of Congress is simply revisory and advisory. If the king did not assent, that was the end of the matter. The Constitution, on the contrary, merely secures for legislation the personal scrutiny and counsel of the man who in public estimation is, or may be supposed to be, best fitted for the task. If he does not approve, he does not forbid; he does not, in the sense of the Roman law, veto. On the contrary, he returns the bill to Congress, with his reasons why it should not become a law — reasons which are not fiats, but which are addressed to the legislative intelligence;
The Constitution then requires and commands renewed legislative action — the House to which it is returned “shall enter the objections at large on their journal and proceed to reconsider it.” The only condition which the Constitution imposes upon the renewed legislation is that the bill shall be enacted by a decisive majority; “if approved by two-thirds” of each House “it shall become a law.”
Wliat this decisive majority may be within the intent of the Constitution has been, and may again be, a matter of grave consideration.
On the 7th July, 1856, the Senate of the United States decided, by a vote of 34 to 7, that two-thirds of a quorum only were requisite to pass a bill over the President’s veto, and not two-thirds of the whole Senate. (Paschal, note 68). And it is understood that this has been, and still is, the legislative construction of the words “two-thirds of the House.”
The Constitution declares that “a majority of each House shall constitute a quorum. ” Therefore it will require only two-thirds of the majority of each House to enact a law, notwithstanding the objections of the President. How small a vote this is, what a trivial impediment to legislation the revisory power of the President really is, may be seen in a single-illustration. The Senate of the United States now consists of 88 members, 45 of whom constitute a quorum, and 30, two-thirds of a quorum. If these 30 approve a bill which the *540 President has not approved it can pass tbe Senate. And it is witbin tbe constitutional bounds of possibility that a bill may “become a law,” notwithstanding tbe objections of tbe President, by tbe approval of a minority of each House, consisting of only one, or at most two, members in excess of “one-tbird [ of tbe members ] of tbat House.”
Here, however, it should be said tbat this construction of tbe two-third clause bas never been brought to tbe test of judicial determination. Another article of tbe Constitution likewise refers to a two-tbirds vote, but uses very different language: “He shall have power, by and with tbe advice and consent of tbe Senate, to make treaties, provided two-tbirds of the Senators present concur.” A State constitution, which will hereafter be considered, likewise said, “ if approved by two-tbirds of the members present it shall become a law.” Whether this diversity of language implies a diversity of intent; whether tbe “two-tbirds of that House” in tbe one article is identical in meaning with tbe “two-tbirds of the Senators present” in tbe other is not a question before tbe court, and concerning it no opinion is expressed. It is sufficient to say tbat, under either interpretation, tbe only condition which tbe Constitution imposes upon tbe enactment of a law objectionable to tbe President is tbat it shall be enacted by a decisive majority.
It is apparent, then, tbat tbe purpose of tbe Constitution is to secure to tbe people of this country tbe best legislation by tbe simplest means. Its framers being mindful of tbe errors and oversights which are bred in tbe heat and strife and divided responsibility of legislative assemblies, and which they bad repeatedly beheld in State legislatures, determined to secure to tbe people tbe benefits of revision, and to unite with tbe power of revision tbe check of undivided responsibility, and to place tbe power in tbe bands of tbe person in whom tbe nation repose, for tbe time being, tbe most confidence. The so-called veto power may therefore be defined to be: An auxiliary power of revision lodged in tbe officer charged by tbe Constitution with tbe duty of seeing “that tbe laws be faithfully executed,” and who witbin tbe intent of the Con stitution is, in tbe expressed opinion of a majority of bis countrymen, tbe greatest and wisest statesman of tbe day.
Tbe conclusion drawn from tbe text of tbe Constitution tbat the approval or disapproval of a bill by tbe President is not *541 an exercise of the legislative power is rendered certain by referring to the history of the provision.
The well-known encomium of Blackstone trpon the British constitution, in which he says, “It is highly necessary for preserving the balance of the constitution that the executive power should be a branch, though not the whole, of the legislative,” and likens the Commons, Lords, and Crown to “three distinct powers in mechanics5 they jointly impel the machine of government in a direction different from what either, acting by itself, would have done, but at the same time in a direction partaking of each, and formed out of all; a direction which constitutes the true line of the liberty and happiness of the community,” has done much to fasten an erroneous belief upon the. American legal mind. There was a time when that wonderful analysis of the laws of England was read by every law student and its statements accepted as unquestionable truths. The great commentator was well characterized by the historian Gibbon as the “orthodox Judge Blackstone.” As an instructor of English youth it was his mission to uphold the prerogatives of the Crown, and he believed with his whole heart in the supreme wisdom of the constitution which he extolled.
Dealing with an unwritten constitution, which changes, but changes insensibly, the time had hot then come when a professor of law in an English university could say that one of its cardinal articles had been expunged and was now obsolete. Yet such was the fact. When he was reading his lectures to young Englishmen at Oxford in 1756 the words of royal dissect, le roy s’misera, had not been spoken of an English statute for sixty-four years. When he published his lectures in 1765, the legislative power of the Crown had passed out of the British constitution and was never to be exercised again. When the convention in 1787 was framing the legislative article of the Constitution it had not been exercised, as he believed, within the lifetime of the oldest member.* At the time of the adop *542 tion of the Constitution it was as distant from the men of that day as the proceedings of the convention are distant from ourselves. It existed only in theory and the pages of Blackstone. The ceremony of approving bills continued and still continues 5 but approval where there can be no disapproval is but a form. During the reign of Elizabeth forty-eight bills were vetoed at a single session; during the last century the royal power of dissent was exercised but once, and for the last time in 1708, and related to a Scottish bill. The members of the convention were men of profound political wisdom, struggling with real problems, that lesser men would have found insoluble, and intent on practical results which should be as little objectionable as possible to their countrymen but for the permanent welfare of their country; and it is inconceivable that, for-fanciful reasons, they would have imported an obsolete relic of the British constitution which had again and again been a cause of disaster to the nation and of danger to the Crown.
Ten years before the convention assembled in Philadelphia, which in the brief period of a hundred days was to forge “the most wonderful work ever struck off at one time by the brain *543 and purpose of man,” the people of tlie State of New York framed tbeir first constitution. The third article of that instrument is in these words:
“And whereas laws inconsistent with the spirit of this, constitution, or with the public good, muy he hastily and unadvisedly passed: Be it ordained tliat the governor for the time being, the chancellor, and the judges of the Supreme Court, or any two of them, together with the governor, shall be, and hereby are, constituted a council to revise all bills about to be passed into laws by the legislature; and for that purpose shall assemble themselves from time to time when the legislature shall be convened; for which, nevertheless, they shall not receive any salary or consideration, under any pretense whatever. And that all bills which have passed the senate and assembly shall, before they become laws, be presented to the said council for their revisa! and consideration; and if upon such revision and consideration, it should appear improper to the said council, or a majority of them, that the said bill should become a law of this State, that they return the same, together with their objections thereto, in writing, to the senate or house of assembly (in whichsoever the same shall have originated), who shall enter the objections sent down by the council at large in their minutes, and proceed to reconsider the said bill. But if after such reconsideration, two-thirds of the said senate or house of assembly shall, notwithstanding the said objections, agree to pass the same, it shall, together with the objections, be sent to the other branch of the legislature, where it shall also be reconsidered, a/nd, if approved by two-thirds of the members present, shall be a lato.
“And in order to prevent any unnecessary delays, be it further ordained, that if any bill shall not be returned by the council within ten days after it shall have been presented, the same shall be a law, unless the legislature shall, by their adjournment, render a return of the said bill within ten days impracticable, in which case the bill shall be returned on the first day of the meeting of the legislature after the expiration of the said ten days. Constitution, New York, 1777, Art. III. (The italicised words in the above are used in the Constitution of the C nited States, verbatim, except where the plural has been changed to the singular.)”
Here, then, we find the Constitution; clause by clause, word for word. (1) That every bill shall be subject to revision. (2) That “before it becomes a law” it shall “bepresented” to the revising power. (3) That if not approved it shall be “returned.” (4) That when returned there shall be sent with it the “ objections” there may be against it. (5) That it shall be returned to the House in which it “ originated. ” (6) That *544 the objections shall be entered “ at large” on the journal. (7) That the House “ shall proceed to reconsider” the bill. (8) That it shall require a “ two-tliirds” vote to pass it. (9) That it shall then “ together with the objections” be “ sent to the other ” House. (10) That it shall there also be “ reconsidered.” (11) That if it be„liltewise “ approved by two-thirds” it “ shall be a law.” (12) That if not returned “ within ten days after it shall have been presented ” it shall likewise “ be a law, ” “unless” the legislature “by their adjournment” prevent a return, hi which case it shall not be a law. These twelve provisions, mutatis mutandis, were transferred to the Constitution, in ipsissimis verbis. The only material change which the convention made was in the two-thirds clause, from which they struck the words “of the members present” and inserted in. their stead “ of that House. ”
It is manifest, then, that the convention turned from the constitution of England to the constitution of New York. When they did so the man did not live who regarded the council of revision as the successor of the Crown, or its approval and disapproval of bills as an exercise of the royal prerogative or a legislative power. But this is not left to inference or conjecture.
On the 29th May, 1787, Randolph, speaking on behalf of the members from Virginia, “opened the main business” of the convention by commenting “on the difficulty of the crisis” and presenting a sketch of the remedy, which had been formulated in fifteen resolutions. These resolutions were used by the convention as the basis of discussion and action in determining the principles which should be embodied by proper committees in the formal instrument. “It was then resolved that the House will to-morrow resolve itself into a committee of the whole house to consider of the state of the American Union, and the propositions moved by Mr. Randolph be referred to said committee.” The eighth resolution is in these words:
“ Resolved, That the Executive, and a convenient number of the national judiciary, ought to composea council of revision, with authority to examine every act of the national'legislature before it shall operate, and every act of a particular legislature before a negative thereon shall be final; and that the dissent of the said council shall amount to a rejection, unless the act of *545 the national legislature be again passed, or that of a particular legislature be again negatived by-of the members ot each branch.”
This paper, then, pro hae vice, was founded on the constitution of New York.
At an early day, June 6, this question of legislative power, was determined by two decisive votes. The convention adopted the principle of revision, but being mindful, as Eutledge after-wards said, that “ the judges ought never to give their opinion on a law till it comes before them,” and that they “ of all men are the most unfit to be concerned in the Ee visionary Council,” struck out Eandolph’s “convenient number of the national judiciary” and left the power of revision in the President alone. At a later day, August 6, Eutledge “ delivered in the Eeport of the Committee on Detail,” the committee which embodied the previously ascertained views of the convention in a draft of the proposed Constitution; This section was couched in the very words of the constitution of New York: Every bill shall be presented to the President “ for Ms revision;” “ if upon such revision” he approve it, he shall sign it; “if upon such revision it shall appear to him improper for being passed into a law,” he shall return it. On the 15th of August, with this word revision three times repeated, “ the thirteenth section of article 6, as amended, was then agreed to” by all the States. It is this vote which is expressive of the final intent of the convention. The verbal form in which the provision stands in the Constitution was the work of the Committee on Style.
This “ revisionary business,” as Madison calls it, came up again and again; appears and reappears in his Journal from the 6th of June to the 16th of August; was considered and reconsidered, discussed and rediscussed. The views of members swung between the extremes of absolute affirmative power in Congress and absolute negative power in the President. The proposition of Hamilton, “to give the Executive an absolute negative on the laws,” identical with the legislative power of the Crown, was rejected by ten States and supported by none. The proposition of Madison to add the judges of the Supreme Oourt in the “revision” of bills was likewise rejected. At last the deliberations ended where they had begun. The convention held fast to the principle of a Council of Eevision and left the duties of the council in the President alone. He *546 was to be the Council of Revision. In the words of Madison, tbe convention “gave the Executive alone, without the judiciary, the revisionary control on the laws, unless overruled by two-thirds of each branch.” *
The Constitution is not a code of administrative procedure, but a frame of government. The subject before the convention was not the paltry question, whether the President should approve a bill ten minutes before Congress adjourned or two days afterwards, but whether a power of revision should be lodged in the Executive. When that was determined affirmatively it was at the same time determined that it should be strictly a power of revision, and not a power of veto; that his assent should not be essential to the enactment of a single law. Accordingly, when it was decided that his duties should be only revisory and advisory, it became essential that he should inform the lawmaking power of the objectionable matter in a bill, to the end that Congress might reconsider it and remedy its errors or defects. But it was also essential that this should be done within a reasonable time, otherwise the Executive might defeat the legislative will and indirectly become a part of the lawmaking power. Accordingly, a period of ten days was prescribed, and the restriction was ingeniously contrived *547 so that it should execute itself; if the President should neglect both to approve a bill and to return it to Congress with his objections, it should be deemed unobjectionable.
But, again, it might be possible that when the President had examined a bill which he could not approve, Congress, by their adjournment, might have prevented him from returning it with his objections. What, then, should be done? He could not sign it because he could not approve it. If he could not approve it, and could not return it, what should be the resulting effect ? The Constitution provided for the contingency by saying, “In which case it shall not be a law.” But there is no provision which guards against the contingency of the President approving a bill after the adjournment of Congress. None was intended, and none was needed.
The Constitution, thén, contains these provisions:
(1) It declares that if the President approve a bill he shall sign it.
(2) It declares, likewise, that if he shall not approve a bill he shall return it with his objections to that House in which it originated.
(3) It provides, by necessary implication, that the time within which the President shall sign a bill or return it shall be a period of ten days, Sundays excepted, after it has been presented to him.
(4) It declares that if the President shall neither approve a bill nor return it within the prescribed period, his neglect shall not defeat the legislative purpose, and the bill shall become a law.
(5) It declares that if, at the expiration of the timé allowed, the President does not approve and will not sign a bill, and can not return it to Congress with his objections because of their adjournment, the bill shall not become a law.
Here the Constitution leaves the subject.
The usage of three-quarters of a century is easily explained. When it began there was not a telegraph, or railroad; or steamboat in the world. Therefore, that which is always desirable was doubly desirable — that the President should complete the work of revision before the dispersion of Congress. The first session of the First Congress ended on the 29th September, 1789. The statutes signed on that day no more than fill two pages of the printed laws. Congress, moreover, was free *548 to prolong’ the session until assured by the President that be had nothing more to communicate. The second session ended on thel2th day of August, 1790, on which day there were but two short acts signed. The third session ended on the 3d of March, 1791. There was then a larger number of acts approved, the chief of Avhich was framed by the Secretary of the Treasury, but all of them could have been scrutinized by the President within three hours, and at least one had been presented to him several days before. Succeeding Presidents for the same reason pursued the same course. President after President came to the discharge of the duty and followed the precautionary practice of his predecessors. In time practice ripened into usage. No President cared to assume a new responsibility, and all shrunk from attaching to a law of the United States the suspicion of un constitutionality. At last the spell of usage was broken by tbe abandoned and captured property act, when the mind of a great statesman measured the responsibilities of situation, and his hand signed the bill.
The other constitutional questions involved have been examined by our brother Weldon in the case of The United States v. La Abra Company et al., and his opinion will be considered as the opinion of the court upon those points in this case.
The order of the court is that the demurrer to the bill be overruled, with leave to the respondents to answer, if they so elect, on or before the 1st day of July next.

Mr. Justice Strong was appointed February 18,1870, just before the cases of Zellner and Anderson were decided, February 28, 1870. He was on the bench when the more important case of Klein was decided, 1872, being one of the majority of the court. As he is now one of the two survivors of the abandoned and captured property period, the following letter is of historic value and significance. The italics are his own.
April 23d, 1891.
My Dear Judge : I have read and re-read carefully your opinion in the case of the United States versus Weil et al. with much interest. It is able, remarkably thorough, and convincing. I concur heartily with it, and I thank you for sending it to me.
Very cordially, yours, " W. Strong.
To the Hon., &c., Judge Nott.

 “ It is true, tie King of Great Britain liad not, as was said, exercised his negative since the revolution” [1688]. Franklins’ speech, June 6,1787. But it has heeii reserved for an American scholar, Hon. William Everett, Member of Congress from Massachusetts, to demonstrate that the writings of historians aud constitutional authorities on the subject of the last exercise of the royal dissent constitute an extraordinary tissue of errors and *542 omissions. Dr. Everett, after consulting thirty of the most prominent historians and text writers, finds that there is “not a single one who does not either omit all allusion to the' fact or commit errors about it more or less serious; always excepting Lord Macaulay, who alludes to it correctly, hut very causually.”
The earlier authorities De Lolme, Christian, Story, and others say that the last withholding of the royal assent was hy William III in 1692; and some of them that he exercised the prerogative four times during his reign. Dr. Everett has shown that he last exercised it in 1696, and that he exercised it at least six times.
A later school of writers, Sir Erskine May, Sir William Anson, and others say that the last exercise of the royal prerogative was hy Queen Anne in 1707, the instance alluded to in the text of the opinion. Dr. Everett has shown that this withholding of royal assent was on the 22d March, 1708 (new style). He has also shown that the withholding of the assent was undoubtedly by the advice of her ministers and with the approbation of Parliament. The hill was to organize the Scotch militia. After its passage and before the end of the session Scotland was threatened with an invasion by the Pretender and a state of insurrection was anticipated. The refusal of the assent was hut another way of withdrawing the bill and was in no sense antagonistic to the two houses of Parliament. It attracted no attention at the time for, as Dr. Everett shows, seventeen historians, some of them then members of Parliament, do not even mention it. (See Dr. Everett’s paper read before the Massachusetts Historical Society. Proceedings, 2d series, yol. v, p. 156.

 From page 541 to this point is believed to be, so far as publication goes, a new chapter in the history of the Constitution, and, substantially, a discovery of the origin of one of its provisions. In connection with it the following confirmatory letter from out most eminent constitutional scholar will be of interest to members of the bar:
Ann Arbor, May 10, 1894.
The Hon. Charles C. Nott:
My Dear Sir: I thank you for sending me a copy of your opinion in The United States v. Weiletal., which seems to me entirely sound and right.
I thank you also for presenting so forcibly the fact that the phraseology of the constitutional provision you had under consideration was taken directly from that respecting the Council of Revision in the constitution of New York. I remember to have noticed this several years ago, but without being impressed by it as you were, and as I probably ought to have been. It only struck me as peculiarly fortunate that when the Convention had rejected the Pennsylvania plan of a Council of Revision and decided upon the Massachusetts plan of a qualified Executive veto they had before them this provision, on the same general lines as that in Massachusetts, but so exactly suiting the case that no one ever raised a question.
Very respectfully, yours,
Thomas M. Cooley.