## THE POCKET VETO CASE.*

No. 565.   Argued March 11, 1929.—Decided May 27, 1929.

* The docket title of this case is *The Okanogan, Methow, San Poelis (or San Poil), Nespelem, Colville, and Lake Indian Tribes or Bands of the State of Washington* v. *United States.*

Mr. *William S. Lewis,* with whom *Messrs. A. R. Serven* and *John G. Carter* were on the brief, for petitioners.

658

660

*Attorney General Mitchell,* with whom *Mr. Robert P. Reeder,* Attorney in the Department of Justice, was on the brief, for the United States.

664

*Mr. Hatton W. Sumners,* as *amicus curiæ,* on behalf of the Committee on the Judiciary of the House of Representatives, by special leave of Court.

668

670

Mr. Justice Sanford delivered the opinion of the Court.

This case presents the question whether, under the second clause in Section 7 of Article I of the Constitution of the United States, a bill which is passed by both Houses of Congress during the first regular session of a particular Congress and presented to the President less than ten days (Sundays excepted) before the adjournment of that session, but is neither signed by the President nor returned by him to the House in which it originated, becomes a law in like manner as if he had signed it.

At the first session of the 69th Congress Senate Bill No. 3185, entitled "An Act authorizing certain Indian tribes and bands, or any of them, residing in the State of Washington, to present their claims to the Court of Claims," having been passed by both Houses of Congress and duly authenticated, was presented to the President on June 24, 1926. On July 3 the first session of the 69th Congress was adjourned, under a house concurrent resolution.[1] The Congress was not again in session until the commencement of the second session on the first Monday in December.[2] And neither House of Congress was in session on July 6—the tenth day after the bill had been presented to the President (Sundays excepted).

---

[1] 67 Cong. Rec., pt. 11, pp. 12770, 12885, 13009, 13018, 13100. By the terms of this resolution the House of Representatives adjourned *sine die;* and the Senate adjourned to November 10—this being the date to which, sitting as a court of impeachment, it had previously adjourned for the trial of certain articles of impeachment. 67 Cong. Rec., pt. 8, pp. 8725, 8733. And on that date the Senate, sitting as a court of impeachment, met and adjourned *sine die.* 68 Cong. Rec., pt. 1, pp. 3, 4.

That the adjournment on July 3 was in effect an adjournment of the first session of the Congress is not questioned.

[2] 68 Cong. Rec., pt. 1, p. 7; Constitution, Art. 1, Sec. 4, Cl. 2.

The President neither signed the bill nor returned it to the Senate. And it was not published as a law.

Taking the position that the bill had become a law without the signature of the President, the Okanogan and other Indian tribes residing in the State of Washington in March, 1927, filed a petition in the Court of Claims setting up certain claims in accordance with the terms of the bill. The United States demurred to the petition. The court sustained the demurrer and dismissed the petition, on the ground that under the provisions of the Constitution the bill had not become a law. 66 C. Cls. 26.

In view of the public importance of the question presented we granted the petitioners a writ of certiorari. 278 U. S. 597. And for like reason, at the request of the Committee on the Judiciary of the House of Representatives, we granted Mr. Sumners, a member of that Committee, leave to appear as *amicus curiae*. He has aided us by a comprehensive and forcible presentation of arguments against the conclusion of the court below.

The clause of the Constitution here in question reads as follows: " Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States; If he approve he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it. If after such Reconsideration two thirds of that House shall agree to pass the Bill, it shall be sent, together with the Objections, to the other House, by which it shall likewise be reconsidered; and if approved by two thirds of that House, it shall become a Law. . . . *If any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the Same shall be a Law, in like Manner as if he had signed it,*

*unless the Congress by their Adjournment prevent its Return, in which Case it shall not be a Law."* [3]

The specific question here presented is whether, within the meaning of the last sentence—which we have italicized—Congress by the adjournment on July 3 prevented the President from returning the bill within ten days, Sundays excepted, after it had been presented to him. If the adjournment did not prevent him from returning the bill within the prescribed time, it became a law without his signature; but, if the adjournment prevented him from so doing, it did not become a law. This is unquestioned.

In support of the position that the adjournment did not prevent the President from returning the bill within the prescribed time, counsel for the petitioners and the *amicus curiae* urge that the only " adjournment " which prevents the President from returning a bill within the prescribed time is the final adjournment of the Congress, terminating its legislative existence and making it impossible for the President to return the bill for its reconsideration; and that an adjournment of the first session of the Congress does not prevent the President from returning the bill within the prescribed time since the legislative existence of the Congress is not terminated, and he may within that time return the bill to the House in which it originated, although not then in session, by delivering it, with his objections, to the Secretary, Clerk, or other appropriate agent of that House, to be held by such agent

---

[3] The third clause reads as follows: " Every Order, Resolution, or Vote to which the Concurrence of the Senate and House of Representatives may be necessary (except on a question of Adjournment) shall be presented to the President of the United States; and before the Same shall take Effect, shall be approved by him, or being disapproved by him, shall be repassed by two thirds of the Senate and House of Representatives, according to the Rules and Limitations prescribed in the Case of a Bill."

and presented to the House when the Congress resumes its sitting at the next session—thereby enabling the Congress to proceed with the reconsideration of the bill as a part of the unfinished legislative business carried over from the first session. And it is also said, by counsel for the petitioners, that the " ten days " allowed for the return of the bill, may be construed as meaning " legislative days," that is, days on which the Congress is in legislative session, and not calendar days, thereby enabling the President to return the bill within ten days, Sundays excepted, exclusive of all days on which the Congress was not in legislative session, even although, by reason of an adjournment, this period does not expire until after the Congress has resumed its legislative sittings at the second session.

In support of the position that Congress by the adjournment on July 3 prevented the President from returning the bill within the prescribed time, the Attorney General maintains that the word " adjournment " includes an interim adjournment as well as the final adjournment at the end of a Congress; that the words " ten days " mean calendar days, and not legislative days; that the President cannot return a bill with his objections to the House in which it originated except by returning it to the House while in session; that if, by reason of an adjournment taken by Congress within the prescribed time, the House in which the bill originated be not in session on the last of such days and the bill cannot be thus returned, the President is thereby prevented from returning the bill within the prescribed time; and that this view is supported by the practical construction given to the constitutional provision by the President through a long course of years, in which Congress has acquiesced.

No light is thrown on the meaning of the constitutional provision in the proceedings and debates of the Constitutional Convention; and there has been no decision of

this Court dealing directly with its meaning and effect in respect to the precise question here involved. And while we have been cited to various decisions of state courts construing similar provisions in state constitutions, an examination of them discloses such a conflict of opinion—due in some part to differences in phraseology or their application to the procedure of the state legislatures—that, viewed as a whole, they furnish no substantial aid in the determination of the question here presented and a detailed consideration of them here would not be helpful. For that reason we shall cite in this opinion only some that seem most apposite and persuasive in their reasoning.

1. It is earnestly insisted by counsel for the petitioners and by the *amicus curiae,* as the underlying basis of their contentions, that since clause 2 gives the President merely a qualified negative over legislation and requires him, if he disapproves a bill, to return it with his objections to the House in which it originated so that Congress may have an opportunity to reconsider it in the light of such objections and pass it by a two-thirds vote of each House, the provision as to the return of a bill within a specified time is to be construed in a manner that will give effect to the reciprocal rights and duties of the President and of Congress and not enable him to defeat a bill of which he disapproves by a silent and " absolute veto," that is, a so-called " pocket veto," which neither discloses his objections nor gives Congress an opportunity to pass the bill over them. This argument involves a misconception of the reciprocal rights and duties of the President and of Congress and of the situation resulting from an adjournment of Congress which prevents the President from returning a bill with his objections within the specified time. This is illustrated in the use of the term " pocket veto," which does not acurately describe the situation, and is misleading in its implications in that it suggests that the

failure of the bill in such case is necessarily due to the disapproval of the President and the intentional withholding of the bill from reconsideration. The Constitution in giving the President a qualified negative over legislation—commonly called a veto—entrusts him with an authority and imposes upon him an obligation that are of the highest importance, in the execution of which it is made his duty not only to sign bills that he approves in order that they may become law, but to return bills that he disapproves, with his objections, in order that they may be reconsidered by Congress. The faithful and effective exercise of this momentous duty necessarily requires time in which the President may carefully examine and consider a bill and determine, after due deliberation, whether he should approve or disapprove it, and if he disapproves it, formulate his objections for the consideration of Congress. To that end a specified time is given, after the bill has been presented to him, in which he may examine its provisions and either approve it or return it, not approved, for reconsideration. See *La Abra Silver Mining Co.* v. *United States,* 175 U. S. 423, 455.[4] The power thus con-

---

[4] Compare *The People* v. *Bowen,* 30 Barb: (N. Y.) 24, 32, 34; *Lankford* v. *County Commrs. of Somerset County,* 73 Md. 105, 110, 111; *Tuttle* v. *Boston,* 215 Mass. 57, 58, 60; and *The People* v. *Hatch,* 33 Ill. 9, 129, 135, 136, in which it was aptly said, in a concurring opinion: "The convention which framed our Constitution designed to provide for the enactment and enforcement of salutary laws in the mode best calculated to promote the general welfare. They supposed, as one of the means of best attaining this end, that the executive of the State should not only be intrusted with the enforcement of all laws, but should also be vested with a voice in their adoption. In distributing the powers of government, they could, if they had chosen to do so, have authorized the general assembly to adopt laws independent of all executive action. But to prevent the evils of hasty, ill considered legislation, they conferred upon the governor the power to arrest the passage of a bill until his objections could be heard, and the bill be again considered and adopted. As the best means of accomplishing this, and of preventing the adoption

ferred upon the President cannot be narrowed or cut down by Congress, nor the time within which it is to be exercised lessened, directly or indirectly.[5]  And it is just as essential a part of the constitutional provisions, guarding against ill-considered and unwise legislation, that the President, on his part, should have the full time allowed him for determining whether he should approve or disapprove a bill, and if disapproved, for adequately formulating the objections that should be considered by Congress, as it is that Congress, on its part, should have an opportunity to re-pass the bill over his objections.

It will frequently happen—especially when many bills are presented to the President near the close of a session, some of which are complicated or deal with questions of great moment—that when Congress adjourns before the time allowed for his consideration and action has expired, he will not have been able to determine whether some of them should be approved or disapproved, or, if disapproved, to formulate adequately the objections which should receive the consideration of Congress.  And it is plain that when the adjournment of Congress prevents the return of a bill within the allotted time, the failure of the bill to become a law cannot properly be ascribed to the disapproval of the President—who presumably would have returned it before the adjournment if there had been sufficient time in which to complete his consideration and

---

of injurious measures, they gave to the governor ten days, exclusive of Sundays, in which to bestow that careful examination and consideration, so essentially necessary to determine the effects and consequences likely to flow from the adoption of a new measure. This is the duty imposed, and it is one that must be performed. And the time allowed for the purpose cannot be abridged, or the provision thwarted, by either accident or design. The use of the whole time given to the governor must be allowed. The Constitution has spoken and it must be obeyed." 

[5] Compare *Tuttle* v. *Boston, supra*, 60; *The People* v. *Hatch, supra*, 136.

take such action—but is attributable solely to the action of Congress in adjourning before the time allowed the President for returning the bill had expired. Thus, in *La Abra Silver Mining Co.* v. *United States, supra,* 454, this Court said that "if by its action, after the presentation of a bill to the President during the time given him by the Constitution for an examination of its provisions and for approving it by his signature, Congress puts it out of his power to return it, not approved, within that time to the House in which it originated, then the bill falls, and does not become a law."[6]

2. There is plainly no warrant for adopting the suggestion of counsel for the petitioners—which is not urged by the *amicus curiae*—that the phrase "within ten Days (Sundays excepted)," may be construed as meaning, not calendar days, but "legislative days," that is, days during which Congress is in legislative session—thereby excluding all calendar days which are not also legislative days from the computation of the period allowed the President for returning a bill. The words used in the Constitution are to be taken in their natural and obvious sense, *Martin* v. *Hunter's Lessee,* 1 Wheat. 304, 326, and are to be given the meaning they have in common use unless there are very strong reasons to the contrary. *Tennessee* y. *Whitworth,* 117 U. S. 139, 147. The word "days," when not qualified, means in ordinary and common usage calendar days. This is obviously the meaning in which it is used in the constitutional provision, and is emphasized by the fact that "Sundays" are excepted. There is nothing whatever to justify changing this meaning by inserting the word "legislative" as a qualifying adjective. And no President or Congress has ever suggested that the Pres-

---

[6] And if Congress so desires the same bill may be re-introduced and passed when Congress resumes its session, and after receiving the due consideration of the President, if returned with his objections, may be then passed by the requisite vote in both Houses.

ident has ten "legislative days" in which to consider and return a bill, or proceeded upon that theory.

3. Nor can we agree with the argument that the word "adjournment" as used in the constitutional provision refers only to the final adjournment of the Congress. The word "adjournment" is not qualified by the word "final;" and there is nothing in the context which warrants the insertion of such a limitation. On the contrary, the fact that the word "adjournment" as used in the Constitution is not limited to a final adjournment, is shown by the first clause in section 5 of Article I, which provides that a smaller number than a majority of each House may "adjourn" from day to day, and by the fourth clause of the same Article, which provides that neither House, during the session of Congress, shall, without the consent of the other, "adjourn" for more than three days. And the Standing Rules of the Senate refer specifically to motions to "adjourn to a day certain" (No. XXII); and the Rules of the House of Representatives, to an "adjournment" at the end of one session (No. XXVI).[7]

4. We think that under the constitutional provision the determinative question in reference to an "adjournment" is not whether it is a final adjournment of Congress or an interim adjournment, such as an adjournment of the first session, but whether it is one that "prevents" the President from returning the bill to the House in which it originated within the time allowed. It is clear, and, as

---

[7] The view that the "adjournment" contemplated in the constitutional provision is the final adjournment of Congress, and not an interim adjournment, appears to have been expressed in behalf of Congress, for the first and only time, in a report made by the Judiciary Committee of the House of Representatives in 1927 (H. Rep't. No. 2054, 69th Cong., 2d sess.). This was followed by the Chairman of the Committee of the Whole in overruling a point of order made against a provision in an appropriation bill that presented this question; and no appeal was taken from this ruling. 68 Cong. Rec., pt. 5, pp. 4932-4937.

we understand, is not questioned, that since the President may return a bill at any time within the allotted period, he is prevented from returning it, within the meaning of the constitutional provision, if by reason of the adjournment it is impossible for him to return it to the House in which it originated on the last day of that period. It is also conceded, as we understand, that the President is necessarily prevented from returning a bill by a final adjournment of the Congress, since such adjournment terminates the legislative existence of the Congress and makes it impossible to return the bill to either House. And the crucial question here presented is whether an interim adjournment of Congress at the end of the first session, as the result of which, although the legislative existence of the House in which the bill originated has not been terminated, it is not in session on the last day of the period allowed the President for returning the bill, likewise prevents him from returning it to such House. This brings us to the specific question whether, in order to return the bill to the House in which it originated, within the meaning of the constitutional provision, it is necessary, as the Attorney General insists, that it be returned to the House itself while it is in session, or whether, as urged by counsel for the petitioners and by the *amicus curiae,* it may be returned to the House, although not in session, by delivering it to an officer or agent of the House, to be held by him and delivered to the House when it resumes its sittings at the next session.

Clause 2 specifically provides that if the President does not approve a bill " he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it." That is, it provides in the same phrase and with no change in definition, that the " House " to which the bill is to be returned is that which

is to enter the objections on its journal and proceed to reconsider the bill.

From a consideration of the entire clause we think that the "House" to which the bill is to be returned, is the House in session. In *Missouri Pac. Ry. Co.* v. *Kansas*, 248 U. S. 276, 280, 281, 283, this Court, in holding that the provision in this clause requiring a vote of two-thirds of each House to pass a bill over the President's objections, means two-thirds of a quorum of each House and not two-thirds of all its members, said *arguendo*, that "the context leaves no doubt that the provision was dealing with the two houses as organized and entitled to exert legislative power," that is, the legislative bodies "organized conformably to law for the purpose of enacting legislation"; and, after stating that the identity between this provision and that in Article V of the Constitution, giving "two-thirds of both Houses" the power to submit amendments, makes the practice as to one applicable to the other, quoted with approval the "settled rule . . . clearly and aptly stated" by the Speaker, Mr. Reed, in the House, on the passage of the amendment to the Constitution providing for the election of Senators by the vote of the people, as follows: "What constitutes a House? A quorum of the membership, a majority, one-half and one more. That is all that is necessary to constitute a House to do all the business that comes before the House. Among the business that comes before the House is the reconsideration of a bill which has been vetoed by the President; another is a proposed amendment to the Constitution; and the practice is uniform in both cases that if a quorum of the House is present the House is constituted and two-thirds of those voting are sufficient in order to accomplish the object. . . ."

Since the bill is to be returned to the same "House," and none other, that is to enter the President's objections

on its journal [8] and proceeded to reconsider the bill—there being only one and the same reference to such House—it follows, in our opinion, that under the constitutional mandate it is to be returned to the "House" when sitting in an organized capacity for the transaction of business, and having authority to receive the return, enter the President's objections on its journal, and proceed to reconsider the bill; and that no return can be made to the House when it is not in session as a collective body and its members are dispersed. This is the view expressed in 1 Curtis' Constitutional History of the United States, 486, n. 1, in which it is said: "This expression, a 'house,' or 'each house,' is several times employed in the Constitution with reference to the faculties and powers of the two chambers respectively, and it always means, when so used, the constitutional quorum, assembled for the transaction of business, and capable of transacting business. This same expression was employed by the committee when they provided for the mode in which a bill, once rejected by the president, should be again brought before the legislative bodies. They directed it to be returned '*to that House in which it shall have originated*'—that is to say, to a constitutional quorum, a majority of which passed it in the first instance. . . ."

This accords with the long established practice of both Houses of Congress to receive messages from the President while they are in session. See Senate Standing Rule XXVIII, cl. 1; House Rule XL; 5 Hind's Precedents of the House of Representatives, ch. CXXXVIII, especially sec. 6591, p. 812.

We find no substantial basis for the suggestion that although the House in which the bill originated is not in session the bill may nevertheless be returned, con-

---

[8] The journal is the record that each House is required to keep of its own proceedings. Const., Art. I, sec. 5, cl. 3.

sistently with the constitutional mandate, by delivering it, with the President's objections, to an officer or agent of the House, for subsequent delivery to the House when it resumes its sittings at the next session, with the same force and effect as if the bill had been returned to the House on the day when it was delivered to such officer or agent. Aside from the fact that Congress has never enacted any statute authorizing any officer or agent of either House to receive for it bills returned by the President during its adjournment, and that there is no rule to that effect in either House, the delivery of the bill to such officer or agent, even if authorized by Congress itself, would not comply with the constitutional mandate. The House, not having been in session when the bill was delivered to the officer or agent, could neither have received the bill and objections at that time, nor have entered the objections upon its journal, nor have proceeded to reconsider the bill, as the Constitution requires; and there is nothing in the Constitution which authorizes either House to make a *nunc pro tunc* record of the return of a bill as of a date on which it had not, in fact, been returned. Manifestly it was not intended that, instead of returning the bill to the House itself, as required by the constitutional provision, the President should be authorized to deliver it, during an adjournment of the House, to some individual officer or agent not authorized to make any legislative record of its delivery, who should hold it in his own hands for days, weeks or perhaps months,—not only leaving open possible questions as to the date on which it had been delivered to him, or whether it had in fact been delivered to him at all, but keeping the bill in the meantime in a state of suspended animation until the House resumes its sittings, with no certain knowledge on the part of the public as to whether it had or had not been seasonably delivered, and necessarily causing delay in its reconsideration which the Constitution evidently intended to avoid. In short, it was plainly the object

of the constitutional provision that there should be a timely return of the bill, which should not only be a matter of official record definitely shown by the journal of the House itself, giving public, certain and prompt knowledge as to the status of the bill, but should enable Congress to proceed immediately with its reconsideration; and that the return of the bill should be an actual and public return to the House itself, and not a fictitious return by a delivery of the bill to some individual which could be given a retroactive effect at a later date when the time for the return of the bill to the House had expired.

Thus Attorney General Devens, in a memorandum to President Hayes, said: "All these provisions indicate that in order to enable the President to return a bill the Houses should be in session; and if by their own act they see fit to adjourn and deprive him of the opportunity to return the bill, with his objection, and are not present themselves to receive and record these objections and to act thereon, the bill can not become a law unless ten days shall have expired during which the President will have had the opportunity thus to return it. There is no suggestion that he may return it to the Speaker, or Clerk, or any officer of the House; but the return must be made to the House as an organized body." [9]

It is significant that only one attempt has ever been made in Congress to authorize the President to return a bill when the House in which it originated was not in session; and that this failed. In 1868 a bill was reported by the Senate Judiciary Committee for regulating the return of bills by the President.[10] While this specifically declared that the constitutional provision allowed the President ten calendar days (Sundays excepted) in which to return a bill not approved by him, and that the return

---

[9] Quoted in an opinion of Attorney General Miller, 20 Op. Att. Gen. 503, 506.

[10] S. 366, 40th Cong., 2d sess.

of a bill would be prevented by "the final adjournment of a session" of Congress, although not by an adjournment to a particular day, it provided that if at any time within such ten days the President desired to return the bill to the house in which it originated when such house was not sitting, he might return it to the office of the Secretary of the Senate or Clerk of the House of Representatives, as the case might be, who should endorse thereon the day on which such return was made, and make an entry of the fact of such return in his journal of the proceedings, and that such return should be deemed a return of the bill to all intents and purposes. In the debate in the Senate strong opposition was expressed to this feature of the bill on constitutional grounds; [11] and

[11] In the debate in the Senate the constitutional objections to the provision authorizing the President to return a bill to an officer of the Senate or the House of Representatives when they were not sitting, were clearly and, as we think, convincingly expressed.

Thus Senator Davis said: "(The) Constitution requires that if the President does not approve a bill he shall return it with his objections to the House in which it originated; this bill provides a different mode of disposing of that bill in case Congress has temporarily taken a recess or an adjournment. It dispenses with the requisition of the Constitution that the bill shall be returned to the House, and directs that it be returned to the officer of the House, if the body is not in session. I do not believe it is competent for Congress to make any such change as that. . . . Of course, if (the President) is to return the bill to the House, the House must be in session, because it is not a House unless in session in the sense in which the Constitution requires the bill to be returned to the House by the President with his objections. . . . I think it is the duty of the President, in the plain language of the Constitution, to return the bill, not to the Secretary or Clerk of either House, but to the House itself. That is the unambiguous and plain language of the Constitution. . . . It is returning it to the Senate or the House of Representatives in session, because when it is returned it is to be at once considered again. The Constitution contemplates that simultaneously with the return of the bill to the House in which it originated the House may take up the matter for consideration. . . . I take the

although it passed the Senate by a majority vote, it was never reported from the Judiciary Committee of the House of Representatives, to which it was referred, and thus failed to pass the Congress. It does not appear that this suggestion has ever been renewed in Congress.

---

position that to return the bill to the Clerk of the House of Representatives, if it originated there, or to the Secretary of the Senate, if it originated in the Senate, when those bodies are not in session, is not a return of the bill to the House in which it originated. It is the duty and the right of the President to communicate to the House and not to a ministerial officer of the House. To enable him to communicate to the House it must necessarily be in session, because he can not communicate with either House when it is in any other situation than in actual session. It must be assembled and in actual session. . . . I think, sir, that the Executive may not only claim it as a right, but the House in which a bill originates may claim it as the performance of a duty by him to that House, and the people of the country may claim it as the performance of a duty by him, that he shall return the bill with his objections, not, in vacation, to the Clerk or to the Secretary of the Senate or House of Representatives, but to the body itself, and to enable him to perform that duty that body must necessarily be in session." Cong. Globe, 40th Cong., 2d. Sess., Pt. 2, pp. 1372, 1374, 1405.

Senator Bayard said: "But, Mr. President, there is an additional objection which to my mind is all powerful. The committee propose . . . that if Congress is not in session during the ten days or at the end of the ten days the President may send the bill to the office of the Secretary of the Senate or the Clerk of the House of Representatives, according to the House in which the bill may have originated. There is no such provision in the Constitution; and the settled usage of this Government, without a single exception from its foundation, is that no communication is made by the Executive to either House except to the House in session, and that usage ought to have a controlling influence to exclude the idea which is contained in the provision of the bill that I am now referring to. . . . But further, the very object of the clause looks to the fact that the bill should be returned during the session of the House in which it originated. It looks, if I may so speak, to immediate action on the part of Congress—at all events it looks to giving to Congress the right of immediate action as soon as the objections of the President are received. The Houses are to proceed to consider the objections; they

5. The views which we have expressed as to the construction and effect of the constitutional provision here in question are confirmed by the practical construction that has been given to it by the Presidents through a long

---

are to spread them at large on the Journal; there is to be a reconsideration of the measure formerly under debate. The whole clause looks to speedy action, at all events, upon objections made by the President, and the language employed providing for a return to the House does not imply filing a document with the Clerk or the Secretary when the House is not in session, whether it be the Senate or the House of Representatives. . . . Here the usage of the Government of the United States, from its origin to the present day, is, that in no single case has a President of the United States, on the return of a bill to the Senate or House of Representatives, ever undertaken to file his message with the Clerk of the one or the Secretary of the other; but the action of the Executive has uniformly been by message sent to the House when in session. That is the settled usage; and when you look to the language of the Constitution, that the bill is to be returned to the House, it is certainly forcing language to say that a return to the House means filing a paper with the Secretary or Clerk when the House is not in session." Cong. Globe, 40th Cong., 2d Sess., Pt. 2, pp. 1941, 1942.

Senator Buckalew said: "I should like to know how the Secretary can make entries and make up a Journal when the Senate is not in session. I can understand that when the Senate reconvenes the Clerk may hand to the President of the Senate, just as any member might or any outsider might, the particular paper, and it may then be presented to the Senate, and it may be entered in the Journal. But this bill contemplates that our Secretary shall make and keep a Journal when the Senate is not here at all, when there can be no Journal of its proceedings. . . . (The) Constitution provides that the Senate shall keep a Journal of its proceedings, of what it does itself. In another clause it is provided that when the President returns a bill with his objections that message thus containing his objections shall be entered upon the Journal of the Senate. The fact of receiving such a message and the entry of that message upon the Journal must, in the very nature of the case, be when the Senate itself is in session . . . The Journal is to be kept by the Senate, and it is to be a Journal of what it does, a Journal of its proceedings. . . . The reception of a message from the President of the United States is a proceeding by the Senate; it is an act by the Senate

course of years, in which Congress has acquiesced. Long settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions of this character. Compare *Missouri Pac. Ry. Co. v.*

itself. . . . I think, therefore, it is manifest that under the Constitution of the United States this Journal and the entries upon the Journal are matters which relate to a session of the Senate, an actual session, the personal presence of the body, and that it is not competent for the Senate to commit to one of its own officers, or to any officer of the Government, or to any citizen, the performance of a duty which is by the Constitution charged upon itself and to be performed by itself. . . . Now, one objection which applies to the bill . . . is that it is against the practice of the Government. From the time that Congress first convened together in 1789 down to this time it has been held, and held uniformly, that if the two Houses of Congress adjourned by a concurrent resolution before the expiration of ten days from the presentation of a bill to the President a bill which should then be left in his hands would fail. . . . They have failed upon repeated occasions, not only during recent years, but far back in former times. . . . This bill proposes, in the absence of both Houses of Congress to provide a substitute for the House to which the bill is to be returned. Instead of being returned to the House in which it originated, as the Constitution says, this bill proposes to enact that it shall be returned to the Secretary here alone . . . and that upon the paper . . . being given to that particular person it shall be considered that it has been returned to the House in which it originated. . . . Can anything more flatly contradict common sense, deny the plain fact? Can we constitute our Secretary into the Senate, and can we make the Clerk of the House of Representatives the House for the purpose of doing any official act whatever? You propose that he shall receive the communication from the President as if he were the Senate or the House; that he, sitting anywhere, responsible to nobody, with no check upon him, shall make up a Journal as if he were the Senate or the House for the occasion." Cong. Globe, 40th Cong., 2d. Sess., Pt. 3, pp. 2076, 2077.

And Senator Morton said: " The Constitution . . . contemplates that the bill shall pass from the custody of the President to the custody of the House in which it shall have originated; and we have no power, in my judgment, to say that it shall be sufficient to return

*Kansas, supra,* 284; *Myers* v. *United States,* 272 U. S. 52, 119, 136; and *State* v. *South Norwalk,* 77 Conn. 257, 264, in which the court said that a practice of at least twenty years duration " on the part of the executive department, acquiesced in by the legislative department, while not absolutely binding on the judicial department, is entitled to great regard in determining the true construction of a constitutional provision the phraseology of which is in any respect of doubtful meaning."

A memorandum prepared in the office of the Attorney General showing the results of an exhaustive research of governmental archives for the purpose of disclosing the practical construction placed upon the constitutional provision here involved in reference to so-called " pocket vetoes," was transmitted by the President to Congress in December 1928.[12] This memorandum—the accuracy of which is not questioned—cites more than 400 bills and resolutions which were passed by Congress and submitted to the President less than ten days before a final or interim adjournment of Congress, which were not signed by the President nor returned with his disapproval. Of these, 119 were instances in which the adjournment was that at the end of a session of Congress, as distinguished from the final adjournment of the Congress. None of these bills or resolutions was placed upon the statute books or treated as having become a law; nor does it appear that there was any attempt to enforce them in the courts until the present suit was brought. Of these instances 11 oc-

---

it to the President of the Senate or the Speaker of the House or to the Secretary or Clerk. . . . What has become of the bill? The Constitution does not contemplate such a condition of things. . . . It would be just as good for the private Secretary of the President to retain a bill as for the Secretary of the Senate; just as much a compliance with the provision of the Constitution; and it would be just as satisfactory to my mind for the President to retain it during the odd days as for the Secretary of the Senate to do so." Cong. Globe, 40th Cong., 2d Sess., Pt. 3, pp. 2077, 2078.

[12] Ho. Doc. No. 493, 70 Cong., 2d sess.

curred before the end of President Lincoln's administration, and the remainder from the end of that administration to the present time. They arose under the administration of all the Presidents except ten. These 119 bills and resolutions are thus classified in the brief of the *amicus curiae:* Private relief bills, 36; pension bills, 19; obsolete purposes, 10; relating to District of Columbia, 9; relating to personal status, 8; right of way over Indian and government land, 8; river and harbor bills, 7; disposition of war stores and government property, 5; reduction of national debts, 3; and general legislation, 14. It does not appear that in any of these instances either House of Congress in any official manner questioned the validity and effect of the President's action in not returning the bill after the adjournment of the session, or proceeded on the theory that it had become a law, although neither signed nor returned, until the action was taken in the House Committee of the Whole in 1927 to which we have referred.[18] And in some instances new bills were introduced in place of those that had not been returned. Without analyzing these 119 instances in detail, we think they show that for a long series of years, commencing with President Madison's administration and continuing until the action of the House Committee of the Whole in 1927, all the Presidents who have had occasion to deal with this question have adopted and carried into effect the construction of the constitutional provision that they were prevented from returning the bill to the House in which it originated by the adjournment of the session of Congress; and that this construction has been acquiesced in by both Houses of Congress until 1927.

6. For these reasons we conclude that the adjournment of the first session of the 69th Congress on July 3, 1926, prevented the President, within the meaning of the con-

---

[18] Note 7, *supra.*

stitutional provision, from returning Senate Bill No. 3185 within ten days, Sundays excepted, after it had been presented to him, and that it did not become a law.

The judgment of the Court of Claims is

*Affirmed.*