**PREVOST v. MORGENTHAU, U. S. Sec. of Treas.**

No. 7130.

United States Court of Appeals for the District of Columbia.

Decided June 26, 1939.

Rehearing Denied Aug. 2, 1939.

Ashby Williams, of Washington, D. C., for appellant.

David A. Pine, U. S. Atty., and Stephen P. Haycock and Allen J. Krouse, Asst. U. S. Attys., all of Washington, D. C., for appellee.

Before GRONER, Chief Justice, and MILLER and VINSON, Associate Justices.

VINSON, Associate Justice.

On March 5, 1937, appellant, plaintiff below, demanded of the appellee, defendant below, the payment of $25,000 authorized and directed to be paid to the estate of Teresa de Prevost by S. 1360, which had been passed by the Senate and House of Representatives, enrolled, and presented to the President of the United States on May 25, 1936, pursuant to clause 2, sec. 7, art. I of the Constitution of the United States.[1] The ground of this demand was that the President, though not having approved the bill, had nevertheless failed to return the same, together with his objections thereto, to the House in which it originated in the time and manner pre-scribed by the Constitution, and that, therefore, the bill had become a law in like manner as if the President had signed it. The appellee refused this demand of payment.

On May 6, 1937, appellant brought this suit alleging substantially the same matters contained in his demand, and praying for a rule to show cause why a writ of mandamus should not issue against the appellee requiring him to pay the sum of money authorized and directed to be paid by S. 1360. Appellee answered, denying that the bill had become a law, because it had been disapproved by the President and returned, with his objections, to the Senate, in which it originated, in the time and manner prescribed by the Constitution.

The case was duly tried and the rule discharged by the district Court, whereupon this appeal was taken.

The sole question presented for our decision is whether or not the President returned the bill, and his objections thereto, to the Senate in session within the time and in the manner prescribed by the Constitution. Appellant subdivides this question as follows: First, whether the enrolled bill was actually brought into the Chamber where the Senate was in session on June 5, 1936? Second, if this question be affirmatively answered, was it returned by the President to the Senate as a House of Congress in session, as required by the Constitution?

From documentary evidence, it appears that on June 5, 1936, the tenth day by which it was necessary for the return to be made to the originating House, the Senate was in session; that the Congressional Record for June 5, 1936 shows that the Senate, on that day, received messages from the President; that the Congressional

[1] Article 1, Section 7, Clause 2:
"Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States; If he approve he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it. If after such Reconsideration two thirds of that House shall agree to pass the Bill, it shall be sent, together with the Objections, to the other House, by which it shall likewise be reconsidered, and if approved by two-thirds of that House, it shall become a Law. But in all such Cases the Votes of both Houses shall be determined by Yeas and Nays, and the Names of the Persons voting for and against the Bill shall be entered on the Journal of each House respectively. If any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the Same shall be a Law, in like Manner as if he had signed it, unless the Congress by their Adjournment prevent its Return, in which Case it shall not be a Law." U. S.C.A.Const. Part. 1, p. 118.

Record for June 6, 1936 shows no entries respecting the delivery of any messages from the President of the United States, but, that, on that day, the bill, S. 1360, and the President's message, dated June 5th, stating his objections to this bill, were laid before the Senate, which referred it to the Committee on Claims; that there is no entry on the Senate Journal for June 5th showing the receipt of the bill disapproved by the President; and, that on June 6, 1936 there was an entry on the Senate Journal, which showed that the message disapproving S. 1360 was "laid before" the Senate and that the objections of the President were spread at large upon the Journal.

In addition to this documentary or record evidence, there is direct testimony from several witnesses; Mr. Latta, executive clerk in the office of the President of the United States, testified that it was his duty to carry messages from the President to the Senate; that he had been engaged in that work for 31 years; that at times, in his absence, other persons have carried such messages, but he had personally taken all messages since January, 1936; that as a rule he does not know what is in these messages, but in some special messages he does know; that he had no recollection of having taken S. 1360 to the Senate on June 5, or June 6, 1936; that practically all the messages he takes are sealed before he sees them and he has no knowledge of their contents; that when he takes a message to the Senate in session the following procedure is followed: when he appears at the entrance to the Senate Chamber the doorkeeper admits him into the Senate Chamber and announces him; he is recognized by the presiding officer; upon recognition, he announces that he is directed by the President to deliver to the Senate a message; he then delivers the message to the doorkeeper on the Senate floor; and, that "in his 31 years in the White House delivering these messages to the Senate, it has been the custom or practice to carry or take veto messages to the Senate on the date indicated on the veto."

Mr. Watkins, parliamentarian of the Senate, testified that during 1936 and for several years prior thereto, he was Journal Clerk in the Senate; that it was not the practice of the Journal Clerk to make a record of veto messages until they are actually laid before the Senate, nor the practice of the Senate to take action thereupon until the message is actually laid before it; that nearly every day messages in writing are received from the President of the United States, which are delivered to the Vice President's desk; that he had looked at the Journal of the Senate for June 5, 1936 and found no record therein of any action having been taken on S. 1360, or of its being received, on that day; that on June 5, 1936 the Senate attended the funeral of the Speaker of the House of Representatives, Hon. Joseph W. Byrns; that on June 5, the Senate was considering a revenue bill, and, anxious to complete it, did not adjourn until 9:15 p. m.; that he had no recollection at all of the receipt of the veto message relating to S. 1360; that veto messages are sent from the White House in sealed envelopes; that announcements accompanying approved bills, those signed by the President, appear in the Congressional Record, but not in the Journal, because no action is to be taken on the bills after they have been approved.[2]

Mr. Hess, record clerk at the White House, testified that it was his duty to keep a record of all messages sent to Congress; that the record shows the veto of the bill was dated June 5, 1936; that he had been attached to the staff at the White House for 30 years and that during that time it had been the practice or custom to send veto messages to the Congress on the same day as their date; and, that no records are kept as to the time when bills are sent to the Senate.

The district court found as a fact that the President of the United States signed a message vetoing this bill on June 5, 1936 and that this message was delivered by one of his secretaries on that day to the Senate in session, stating:

"The fact that the Vice President did not lay these messages before the Senate until the next day is immaterial. The President had performed all the duties imposed upon him by the Constitution when he returned these bills to the Senate in session with his objections. Any method of procedure of the Senate which might result in any lack of knowledge of the contents of these messages on the part of cer-

---

[2] The record shows that the message reporting the approval of certain bills was entered upon the Journal of the Senate on June 5, 1936.

tain members of the Senate would not lay any greater duties on the President under the Constitution."

■ The testimony of the several witnesses shows conclusively that S. 1360 was vetoed on the 5th of June, and that no bill was vetoed on the 6th of June. This testimony shows also, without contradiction that there was a custom or practice for the vetoed bills, and the objections of the President thereto, to be sent to the House in which they originated on the date of their disapproval. This testimony with respect to the custom and practice in returning bills by the President to the originating House on the day the veto was signed, no doubt was persuasive to the district court in its decision because there is a presumption in law that procedure adhered to for a number of years was followed in any particular case.[3] The record evidence and the testimony of the witnesses introduced in the case could well have been considered by the district court to show conclusively that the President had returned S. 1360 on the 5th of June, the tenth day, to the Senate in session. This is the showing that messages were in fact sent on the 5th of June, that none were sent on the 6th, and that the objections to this bill were laid before the Senate on the 6th. However, regardless of the motivating reasons for the action of the district court, it made a finding which is supported by substantial evidence, and we must, therefore, accept it.[4] We hold that S. 1360 was actually brought by the President's messenger into the Chambers where the Senate was in session on June 5, 1936, and, after the formalities mentioned in evidence, was delivered to the Senate in session.

■ Appellant argues strongly that even if the bill and message did reach the Senate Chamber on June 5th, while that body was in session, still there was not a constitutional return thereof to the Senate. It is his position that the recital in the Congressional Record, "messages in writing from the President of the United States were communicated to the Senate by Mr. Latta," does not meet the constitutional requirement and is distinctive from an "announcement of a message from the President in respect to the approval of certain bills, which message and announcement became a part of the proceedings of the Senate, and hence a part of the Journal."[5] He says there "is a clear distinction between communicating a message and announcing a message indicating that those that were communicated were merely handed to some individual in the chamber informally and privately, but that those that were announced were formally and publically returned to the body as a whole."[5] We cannot agree that "communicate" either by its accepted meaning, or by the procedure followed in the Senate, indicates a delivery "to some individual in the chamber informally and privately." There is a distinction, however, in the duty of the President in respect of messages expressing approval of bills, and those expressing disapproval. The announcement of bills approved is not required by the Constitution. The signing of the bills make them the law.[6] The announcement is a courtesy to the legislative branch that it may be informed that such bills have become law by executive approval. The listing of those bills of record may well be made for convenience, but it is not compulsory, and adds no force to the act of the President in his approval. Customarily there is no Journal entry as to such announcements since there is no further action for the Senate to take. On the other hand, the Constitution requires the return by the President within a certain time of a bill disapproved, else it becomes law. There is a requirement that the President express his objections and that these objections accompany the disapproved bill. This is the message, which, for convenience of the executive, may be written.[7] Certainly his objections must be returned, with the bill, to the originating House in session. The Senate chooses

[3] Knickerbocker Life Ins. Co. v. Pendleton, 115 U.S. 339, 6 S.Ct. 74, 29 L.Ed. 432; Dunlop v. United States, 165 U.S. 486, 17 S.Ct. 375, 41 L.Ed. 799.

[4] Great A. & P. Tea Co. v. Grosjean, 301 U.S. 412, 420, 57 S.Ct. 772, 81 L.Ed. 1193, 112 A.L.R. 293; Pollock v. Jameson, 63 App.D.C. 152, 155, 70 F.2d 756, 759; Sears v. Sears, 67 App.D.C. 379, 380, 92 F.2d 530, 531; Kraskin v. Kraskin, 70 App.D.C. 85, 104 F.2d 218, 67 Wash.L.Rep. 370.

[5] Appellant's Brief.

[6] Gardner v. The Collector, 6 Wall. 499, 73 U.S. 499, 506, 18 L.Ed. 890.

[7] On May 22, 1935, the President of the United States appeared in person and delivered his veto message orally. 74th Cong., 1st Session. Congressional Record 7993. H.R. 3896.

its own language in showing that this is done. How better could they do it than to say, as here, "messages from the President were communicated to the Senate"— especially when the word "communicate," as defined by Webster, means "1. to impart, bestow, or convey. 2. to make known; to give by way of information."? Certainly, if any of these meanings are given the word "communicate" the Senate has recorded the fact that a return was made of messages by the President.

█ The record contains testimony by Mr. Latta that he followed in this case the same formality of procedure that he followed for over 30 years,[8] by being admitted to the chamber of the Senate, while in session, by the doorkeeper and being presented by him to the President of the Senate. Recognized by the President of the Senate as being a messenger from the President, Mr. Latta stated that he was directed by the President to deliver to the Senate a message, which he then handed to the doorkeeper on the Senate floor. The record then shows that the message disapproving the bill is delivered to the presiding officer of the Senate. This message does not go to the Journal Clerk, and no entry of the time of its receipt, or its receipt itself, is made by the Senate. Under the practice of the Senate it is not spread at large upon the journal until it is laid before the Senate. But that which follows the delivery of the message is no part

of executive duty. It is of the legislative. We hold that when the vetoed bill, with the objections of the President in writing, was passed in the manner above described from the custody of the President into the custody of the originating House in session, there was a "return" in compliance with the requirements of the Constitution.

█ Appellant would not only have the President's messenger perform the ceremony which occurred in this case, but he would require that the messenger announce the objections of the President to the particular bill which is returned without signature. He contends that in this manner the objections would be recorded on the Journal of the House at that time. We do not think that the Constitution requires an announcement of the objections by the messenger. The Constitution states that the bill "shall, before it become a Law, be presented to the President of the United States; if he approve he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it." Undoubtedly the House could proceed to the reading of the message immediately upon its receipt, and it would then appear verbatim in the Congressional Record for that day's proceedings, and it could, by the Senate, be spread upon the Journal of that day's proceedings.[9] In the Constitution, we find no in-

---

[8] This formality is substantially the same as occurs in the House of Representatives:

"6591. *The ceremony of receiving a messenger from the President of the United States in the House.*—The messenger is introduced by the Doorkeeper at the bar of the House, with the words 'Mr. Speaker, a message from the President' (or the Senate, as the case may be). Thereupon the messenger bows and addresses the Speaker as 'Mr. Speaker.' The Speaker, with a slight inclination, addresses the messenger as 'Mr. Secretary,' since such is his title whether he be from the President or the Senate. Thereupon the messenger delivers the message in a distinct voice that should be heard by all the Members present.

"The Secretary of the President makes his announcement in form as follows:

"I am directed by the President of the United States to deliver to the House a message in writing (or 'sundry messages in writing' if there be more than one). Sometimes, also, he adds, if the

occasion require, the words—and to announce his approval of sundry House bills. Frequently the message merely announces the approval of bills." Hinds' Precedents, Vol. 5, p. 812.

[9] Historical data submitted in the brief of appellant shows that until 1815 messengers from the President, returning bills without his approval and his objections thereto, orally identified these bills to the Senate in session, and thereupon, the objections were immediately read and entered upon the Journal. After 1815, this practice was dispensed with and for 121 years prior to the date involved the messengers of the President have delivered the disapproved bills, together with the objections of the President, to the Senate in session without orally identifying bills disapproved. Until 1924, the Journal showed affirmatively the date of the return of the message of disapproval, but since 1924 there is no Journal entry in respect thereof until the messages are laid before the Senate. See Rule VII, infra note 10.

timation that the President's messenger should give vocal expression in respect of the President's objections to the bill.

Nor can we follow the theory of appellant that, if the President's messenger had announced the objections they would become a part of the Journal of the House. It is significant that the Constitution places upon the President the duty of returning bills which he does not favor, together with his objections, to the originating House within a certain time. There is no further duty upon the President. It is declared to be the duty of that House to "enter the Objections at large on their Journal and proceed to reconsider it." Nothing is required to be entered upon the journal except the objections of the President and the record of the votes of the members upon reconsideration. It is manifest that no action that the President could take, no formality whatsoever, could force the House to make any particular entry upon its journal. It is clear that on the return custody is no longer in the President, but is in that House. The President has no control over the Congressional Record, the Journal, the bill, or his objections thereto[10]—there is nothing further remaining for him to do, or that he can do. He has at that time made "an actual and public return to the House itself."[11]

We hold that the method followed in this case by the President, a method that has been long followed by his predecessors, violates in no manner the purpose and scheme of the Constitution, but is a true compliance therewith, and that a contrary holding would be "to ignore the plainest practical considerations and by implying a requirement of an artificial formality to erect a barrier to the exercise of a constitutional right."[12]

Affirmed.

---

[10] The Constitution, Art. I, Cl. 2, Sec. 5, provides that: "Each House may determine the Rules of its Proceedings." In conformity with this clause, the Senate has promulgated Rule VII, which provides: "The Presiding Officer may at any time lay, and it shall be in order at any time for a Senator to move to lay, before the Senate, any bill or other matter sent to the Senate by the President * * *."

The Constitution Art. I, Cl. 3, sec. 5, provides: "Each House shall keep a Journal of its Proceedings, and from time to time publish the same, excepting such Parts as may in their Judgment require Secrecy * * *." In conformity with this provision, the Senate has promulgated Rule IV, which is: "The proceedings of the Senate shall be briefly and accurately stated on the Journal. Messages of the President in full * * * shall be entered." Standing Orders of the Senate, sec. 13, provide: "The Joint Committee shall have control of the arrangement and style of the Congressional Record, and while providing that it shall be substantially a verbatim report of proceedings shall take all needed action for the reduction of unnecessary bulk. * * * "

These two clauses of the Constitution, and the Rules and Orders passed in pursuance thereof, show conclusively the lack of power of the President to control the rules of proceedings, or the records, of the several Houses, and demonstrate forcefully his duty of merely delivering the bill which he disapproves, together with his objections to the House in session.

[11] Pocket Veto Case, 279 U.S. 655, 685, 49 S.Ct. 463, 73 L.Ed. 894, 64 A.L.R. 1434.

[12] Wright v. United States, 302 U.S. 583, 590, 58 S.Ct. 395, 82 L.Ed. 439.