**Kerry GUY, Petitioner-Appellant,**

v.

**STATE of Iowa, Respondent-Appellee.**

**No. 86–206.**

Court of Appeals of Iowa.

Aug. 27, 1986.

Charles Harrington, Appellate Defender, and Michael J. Laughlin, Asst. Appellate Defender, for petitioner-appellant.

Thomas J. Miller, Atty. Gen. and Sarah J. Coats, Asst. Atty. Gen., for respondent-appellee.

Considered by OXBERGER, C.J., and SNELL and SACKETT, JJ.

SACKETT, Judge.

Petitioner Kerry Guy appeals from the district court's denial of his application for postconviction relief. Guy was found guilty by a prison adjustment committee of sexual misconduct and misuse of communications after a letter proposing sexual contact with another prison inmate was found in Guy's cell. Guy contends the district court erred in sustaining the adjustment committee ruling because (1) no prison rules were violated since Guy had not given the letter to a third party; (2) the letter was not a communication within the meaning of prison rules 15 and 40; and (3) the petitioner's first amendment rights were violated. We affirm.

On January 17, 1985, two employees of the Iowa Men's Reformatory in Anamosa discovered a five-page letter written by Guy during a routine search while transferring him from one cell to another. The letter was found in a plastic basket used by prisoners for holding personal belongings. In the letter Guy proposed sexual contact allegedly with another prison inmate:

Hello, I love you, well I guess it will be thirty more days.

\* \* \* \* \* \*

I've been separated from you long enough. Now I have to wait at least thirty more day [sic]. I'm so damn [sic] depressed, I miss you so much. I can't touch you or even talk to you face to face.

\* \* \* \* \* \*

I'm going to check out on going to the Fort, if you don't want me to let me know. I won't go if you won't. I need to find out first if they will send me cause if you ask they might send you and not me. I don't want to be separated that far apart.

\* \* \* \* \* \*

I love you. I think you know that by now, well at least you should. My magic sugar man.

\* · \* \* \* \* \*

Its [sic] 6:00 pm and they just played our jam "Loving You." They play it alot [sic] since I requested it. I love that song, but you more. I know you are probably thinking this is a book, but if I think of you, which is always deep, I won't feel so depressed. I really need to know that you feel & care enough for me to wait a little longer, but if you don't I will understand and try to accept it, just tell me beforehand, okay? I told T today that I was going to settle down with you, he looked shocked and said that I wouldn't do it and it would make all those men go mad. Listen I don't care what they think, business is all and that will involve both of us, alot [sic] of these fools will automatically think of a pimp, Ho [whore] thing but I wouldn't do it if I didn't want to do it for us. . . .

\* \* \* \* \* \*

I was sitting here daydreaming and gave myself three wishes. No. 1. To get out of this place with no string to the court, today. No. 2 Is you with me, well we are together on the streets and No. 3 This is the one I thought of first but, I know its [sic] a almost impossible considering the case, well its [sic] to hear you say "I love you."

\* \* \* \* \* \*

When and if you ever say it I know you will mean it 'cause you are a real Honey Baby of a man, thats [sic] one of the main things I love about you. I know that even if we aren't together my love will go on forever.

\* \* \* \* \* \*

Please write me back soon, it won't be so hot because I will be on Drange (DD II) and I can come straight to my cell, no middleman.

\* \* \* \* \* \*

I can't wait till Feb., but I have to. I'll be like a virgin, my body can't but my love for you will always be new.

\* \* \* \* \* \*

No one's gonna love you the way I do!

Based on the content of the letter a disciplinary report was written on Guy charging him with several prison rule violations. A disciplinary hearing was held before the prison adjustment committee. Guy admitted he had written the letter and intended to send it. However, Guy testified the letter was intended for a person living in Sioux City and not another inmate. The adjustment committee determined Guy was not being truthful about the intended receiver and from the content of the letter the adjustment committee determined it was intended for another prison inmate at the reformatory. The adjustment committee found Guy guilty of sexual misconduct, prison rule 15, and misuse of communications prison, rule 40. As a result Guy lost 15 days of good conduct, was placed in solitary confinement for seven days and held at DD–I maximum security level for an additional 30 days minimum.

Guy filed an application for postconviction relief in the Jones County District Court. After a hearing to the court, the district court denied Guy's application for postconviction relief, finding there was sufficient evidence to support the disciplinary committee's determination Guy was guilty of prison rule violations. This appeal followed.

## I.

Ordinarily, postconviction relief actions are treated as special proceedings at law and review is on assigned errors only. *Kelly v. Nix,* 329· N.W.2d 287, 291 (Iowa 1983). However, where a fundamental constitutional issue is raised, the appel-

late court makes its own independent evaluation of the totality of circumstances in a de novo review. *Williams v. State*, 378 N.W.2d 894, 896 (Iowa 1985). The petitioner has the burden of proof to show a constitutional violation by a preponderance of the evidence. *Id.* at 897.

## II.

The prison adjustment committee found Guy guilty of violating the following rules:

15. *Sexual Misconduct:* An inmate commits sexual misconduct when the inmate *proposes a sexual contact or relationship with another person within the institution* through gestures; such as kissing, petting, etc. or *by written* or oral *communications* or engages in a consensual sexual contact or relationship....

40. *Misuse of Mail, Telephone, and Other Communications:* Any inmate commits an offense under this subsection when the *inmate fails to follow* institutional procedure, *regulations* or instructions, written or verbal *for the use of institutional communication facilities such as the mail* or telephone, or uses such facilities without proper authorization. (emphasis added).

Guy contends he did not violate prison rule 15 or 40 because he never sent the letter which prison officials confiscated in his cell. Hence, he argues his subsequent punishment was actually for merely reducing his private thoughts to writing and violated his first amendment rights.

■ Prisoners are not divested of constitutional rights upon confinement in a correctional institution. *Hudson v. Palmer*, 468 U.S. 517, 522, 104 S.Ct. 3194, 3198, 82 L.Ed.2d 393, 401 (1984); *Wolff v. McDonnell*, 418 U.S. 539, 555–56, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935, 950 (1974) ("There is no iron curtain drawn between the constitution and prisoners of this country.") *Rogers v. Scurr*, 676 F.2d 1211, 1215 (8th Cir. 1982). Prison inmates "retain those First Amendment rights of speech 'not inconsist-

ent with [their] status as ... prisoner[s] or with the legitimate penological objectives of the corrections system.'" *Hudson*, 468 U.S. at 523, 104 S.Ct. at 3198, 82 L.E.2d at 401 (quoting *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495, 501 (1974)). *Scurr*, 676 F.2d at 1215.

■ However, while imprisoned persons enjoy many protections of the Constitution, it is also clear imprisonment carries with it the loss of many significant rights:

These constraints on inmates, and in some cases the complete withdrawal of certain rights, are "justified by the considerations underlying our penal system." (citations omitted). The curtailment of certain rights is necessary, as a practical matter, to accommodate a myriad of "institutional needs and objectives" of prison facilities, (citations omitted) chief among which is internal security (citations omitted).

*Hudson*, 468 U.S. at 522–24, 104 S.Ct. at 3198–99, 82 L.E.2d at 401–02. *See Pell*, 417 U.S. at 822, 94 S.Ct. at 2804, 41 L.Ed.2d at 501. Thus, challenges to prison restrictions asserted to inhibit first amendment interests must be analyzed in terms of the legitimate policies and goals of the correctional institution. *Bell v. Wolfish*, 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447, 473 (1979); *Safley v. Turner*, 777 F.2d 1307, 1310–11 (8th Cir.1985); *Williams*, 378 N.W.2d at 897, 899.

The supreme court has indicated that even in the presence of legitimate first amendment concerns, considerable deference is due to the "expert" judgment of prison administrators:

[T]he problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators should be accorded wide-ranging deference in the adoption **and execution** of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. (citations omitted). "Such considerations are peculiarly within the province and profession-

al expertise of corrections officials, and, **in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations,** courts should ordinarily defer to their expert judgment in such matters." *Pell v. Procunier,* 417 U.S., at 827 [94 S.Ct. at 2806].

*Bell,* 441 U.S. at 547–48, 99 S.Ct. at 1878–79, 60 L.Ed.2d at 473–74. *See Gomes v. Fair,* 738 F.2d 517, 524 (1st Cir.1984).

In *Gomes,* an inmate was reclassified to a maximum security institution for violating a prison rule regarding use of obscene language or actions after giving sexually explicit poems to a prison employee to read. *Gomes,* 738 F.2d at 521–22. The inmate claimed he had not directed obscene language or actions to the prison employee, but rather he was simply exercising his first amendment rights in asking the prison employee to "proofread" his poems which did not mention the employee by name and were not addressed to her. *Gomes,* 738 F.2d at 523. The court of appeals rejected Gomes' argument that prison officials had acted unreasonably in disciplining him since he did not actually "communicate" a sexual proposition to the employee:

> We agree that the issue for a court in a case like this is limited to whether the prison officials were acting in a **good faith and reasonable belief** that the restrictions they were imposing were necessary.... A court should not give "reasonable" such a constricted meaning that it includes only the measures the court would take were it running the prison itself. Even if the prison officials' evaluation of an incident is significantly different from the court's, their view is entitled to prevail so long as honestly held and within rational boundaries.... [I]n assessing the quality of the evidence, the district court must recognize that prison administrators draw upon an experience peculiar to the institutions they control and to the inmates within. Only recently, the Supreme Court said,
>
> > In assessing the seriousness of a threat to institutional security prison administrators necessarily draw on

more then the specific facts surrounding a particular incident; instead, they must consider the character of the inmates confined in the institution, recent and longstanding relations between prisoners and guards, prisoners **inter se,** and the like. In the volatile atmosphere of a prison, an inmate easily may constitute an unacceptable threat to the safety of other prisoners and guards even if he himself has committed no misconduct; rumor, reputation, and even more imponderable factors may suffice to spark potentially disastrous incidents. The judgment of prison officials in this context ... turns largely on "purely subjective evaluations and on predictions of future behavior." (citations omitted). *Hewitt v. Helms,* 459 U.S. 460, 474, 103 S.Ct. 864, 872, 74 L.Ed.2d 675 (1983).

*Gomes,* 738 F.2d at 523, 525. The court of appeals found that if the prison employee interpreted the incident as sexual misconduct, the prison was entitled to initiate the disciplinary action it did:

> Defendants have a strong interest in assuring the safety of prison staff and taking immediate action in the case of inmate threats, no matter how veiled. A sexual advance by an inmate on a staff member is not to be taken lightly; *a sexual proposition need not ripen into a physical assault before prison officials can take steps.*
>
> *Thus if the incident may properly be viewed as a sexual proposition, Gomes's constitutional claim fails, since in the prison setting—unlike the outside— reasonable concerns as to security and discipline are paramount. Id.* at 524.

The instant case is analogous to *Gomes.* In the instant case Guy also contends he was disciplined for exercising his first amendment rights since the letter containing the proposition for sexual contact was never sent. The primary flaw in this analysis is that it pays no attention to the rights of prison administrators to make judg-

ments concerning questions—including close and difficult questions—within their expertise.

In the instant case the letter was confiscated by two prison employees during a routine inmate transfer search. There is nothing in the record nor does Guy allege the purpose of the search was to harass him or infringe on his first amendment rights. Yet, according to Guy's interpretation of the prison rules, if prison officials discovered during a search a letter proposing sexual contact with another inmate, they could take no action. Guy bases that restriction on his contention that the term "communication" as used in prison rules 15 and 40 require the intended recipient receive the letter in order for communication to occur. As such, prison officials would be required to wait until the inmate actually passed the letter to another inmate before disciplinary action could be initiated.

We disagree with Guy's interpretation and find that placing such restrictions on prison officials' ability to execute prison disciplinary policy and procedures would unreasonably impede prison administrators in running the correctional institution. Moreover, Guy's interpretation suggests that *receipt* of the letter may not be enough. Rather, prison officials would have to wait until the inmate *read* the letter in order to take action. Guy's constrained interpretation of the language of the prison rules would make their enforcement extremely difficult and would hinder the ability of prison officials to move quickly to contain potentially volatile situations.

■ Giving appropriate deference to prison authorities and to the realities of the prison environment, we find there was sufficient evidence in the record as a whole from which to conclude that the adjustment committee's action was a reasonable balancing of interests. There is no language in rule 15 which requires a recipient receive the written proposal for sexual contact in order to initiate disciplinary action for sexual misconduct. A rule 15 violation occurs when an inmate in some way does the action of proposing sexual contact with an inmate. In this case Guy's action was to write down that proposal in what he admitted was a letter. Once the inmate does this prohibited action the prison's concern is to contain the situation before it ripens into a more serious problem and to stop the inmate from repeating such actions. Correctional supervisor Tom Anthony's report and the adjustment committee action focused narrowly on disciplining Guy's sexual misconduct and not his letter writing in general, therefore, the disciplinary action did not unreasonably infringe on Guy's first amendment rights.

■ Prison rule 40 also does not contain language requiring the misused means of communications be received by the intended party. Rule 40 simply provides that "communications" such as letters are *means* of communications which are allowed so long as they are not misused. According to rule 15, an inmate who puts a sexual proposition in what he admits to be a letter has, by that action, misused that particular means of communication. Hence, the *sending* of the letter is not where the misuse occurs. Rather, it is the inmate's *action* which constitutes misuse and for which he must be held accountable.

In the instant case, Guy admitted at trial that what the officers has confiscated was a letter, a means of communication, and that he had intended to send it. We do not find credible Guy's argument on appeal that the five-page document was only his personal, private thoughts reduced to writing. This argument is negated by his own testimony he intended to send the letter. We agree with the adjustment committee that Guy's letter contained sexual propositions and the language in the letter made it obvious that the letter was intended for another prison inmate. Therefore, we find Guy misused that means of communication and the adjustment committee's actions in disciplining Guy were justified.

■ In addition, we will not substitute our own opinion where we find the decision of prison officials and the adjustment committee has been reasonable and not an ex-

aggerated response to the situation. In the instant case we find the actions taken by prison officials and the adjustment committee were appropriate and we therefore affirm the trial court's denial of Guy's application for postconviction relief.

AFFIRMED.

SNELL, J., concurs.

OXBERGER, C.J., dissents.

OXBERGER, Chief Judge (dissenting).

I think that the appellant has sustained his burden of demonstrating an infringement of his constitutional rights. Clearly, an inmate's constitutional freedoms are inhibited to the extent that the exercise of such freedoms is inconsistent with necessities of implementing penological objectives and enforcing prison security. *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 3198, 82 L.Ed.2d 393 (1984). In the facts of this case, however, the appellant's exercise of his first amendment rights in no way threatened prison objectives or security.

I disagree with the majority's conclusion that the letter was a "communication" within the meaning of the prison rules. A "communication" is defined as "a deliberate *interchange* of thoughts or opinions between two or more persons...." *Black's Law Dictionary* 253 (rev. 5th ed. 1979) (emphasis added). Similarly, Webster's New Collegiate Dictionary defines a "communication" as "an act or instance of transmitting ... a process by which information is *exchanged* between individuals...." *Webster's New Collegiate Dictionary* 225 (1981) (emphasis added); *see also Prevost v. Morgenthau*, 70 App.D.C. 306, 106 F.2d 330, 334 (D.C.D.C.1939); *Gulf Oil Co. v. Harris*, 425 P.2d 957, 962 (Okla. 1967).

The appellant's letter was never "communicated" because it was never delivered; thus, the letter was nothing more than a statement of thoughts in written form. Punishing such an exercise of first amendment freedoms when no resultant danger is posed seems to represent a retreat to the time when our prison systems were characterized as "a dark and evil world completely alien to the free world." *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) (quoting *Holt v. Sarver*, 309 F.Supp. 362, 381 (E.D.Ark.1970), *aff'd*, 442 F.2d 304 (8th Cir.1971)).