EBER BROS. WINE & LIQUOR
CORPORATION
v.
The UNITED STATES.
No. 126-60.

United States Court of Claims.
Oct. 16, 1964.

Justin N. Feldman, New York City, for plaintiff. James M. Landis and Margaret Taylor, New York City, of counsel.

Irving Jaffe, Washington, D. C., with whom was Asst. Atty. Gen., John W. Douglas, for defendant. M. Morton Weinstein and Edna P. Goldberg, Washington, D. C., were on the brief.

Before JONES and WHITAKER, Senior Judges, and LARAMORE, DURFEE, and DAVIS, Judges.

DAVIS, Judge.

This is a suit on a private bill passed by both Houses which, the plaintiff says, became law when the President failed to veto it within the time prescribed by the Constitution. The defense is that the President validly returned the bill without his approval within the proper time, and that the Congress did not repass the measure. It is agreed that if the bill became law plaintiff is entitled to recover, otherwise not. The only issue is whether the President vetoed and returned the bill "within ten days (Sundays excepted) after it" was "presented to him."

Having been refused (on limitations grounds) a refund of income tax overpayments for 1947 and 1948, plaintiff sought legislative relief. H.R. 2717 of the 86th Congress would waive the time-bar and permit the claims to be considered on their merits.[1] The bill passed the House of Representatives on March 17, 1959, and the Senate on August 27, 1959. It was signed by the Speaker and the presiding officer of the Senate and then delivered by a messenger of the House of Representatives to the White House on August 31, 1959.

On that day President Eisenhower was abroad, on an official visit to nations of the North Atlantic Treaty Organization. He had departed the country on August 26th and he did not return until September 7th. In preparation for this trip, the President had told his staff that, so far as possible, he wanted Congressional bills to be held in Washington until his return. It was decided to stamp bills received at the White House during his absence with the legend, "Held for presentation to the President upon his return to the United States." The White House legislative clerks were instructed to use this stamp on all such bills, as well as on the receipts given to Congress. Before the President's departure, a member of his staff discussed the problem, including the use of this new stamp, with Congressional leaders, but we do not know whether they agreed to the procedure or expressed any view at all.

When H.R. 2717 was delivered to the White House on August 31, 1959, the legislative clerk inadvertently failed, at first, to follow his instructions and did not use the new stamp. He simply noted, in the customary form, that the White House had received the measure. About two-and-a-half hours later, when the oversight came to his attention, he attempted to amend the receipt by adding the words "Held for presentation," etc. This modification was shortly brought to the attention of the House. The new legend was also stamped on the enrolled bill.[2]

1. It was highly probable that the elimination of the time-bar would result in a refund since the Internal Revenue Service had already acceded to refund claims raising the same point for non-barred years.

2. H.R. 2717 and 12 other bills were the first to be received from the House of Representatives after the President's departure (on August 26th). The legislative clerk made the same mistake as to.

Upon the President's return to the United States on September 7th, the White House placed on H.R. 2717 a stamp showing that the bill was presented to him on that date. On September 14, 1959, while the Congress was still in session, the President returned the bill to the House of Representatives with a veto message. This was more than ten days (Sundays excepted) from the time the measure was delivered to the White House on August 31st, but less than ten days (Sundays excepted) from September 7th when the President returned to the country and the White House indicated that the bill had been presented to him. The House of Representatives did not reconsider H.R. 2717 and it was not published as a private law. The Congress remained in session until about daybreak of September 15, 1959.

The theory of President Eisenhower, and of the defendant here, is that in these circumstances the President had the power to direct postponement of presentation to him until his return from abroad. The plaintiff's position is that bills are cus-

tomarily presented to the President through delivery to the White House and that practice cannot be altered without agreement by both the legislative and the executive branches. Since no such agreement has been shown, the President's time expired, plaintiff says, several days before his veto message, and accordingly H.R. 2717 became law without his signature.

I

The timeliness of the President's return of the bill must be adjudged under the constitutional provision (Art. I, section 7) that "If any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the Same shall be a Law, in like Manner as if he had signed it, unless the Congress by their Adjournment prevent its Return, in which Case it shall not be a Law." [3] Every President and every Congress have been governed by these words, but neither the naked language nor the vestments of history furnish a definitive answer to the precise problem before us. [4]

---

the entire group and that mistake was soon corrected as to the entire group. Previously, the Senate had delivered four bills on August 27th and one bill on August 31st. The new stamp had been immediately used on these prior bills and their receipts. It was also used on the 54 measures which were delivered, during the President's absence, after the group which included H.R. 2717.

3. The full text of the constitutional provisions on the President's veto power is as follows:

"Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States; If he approve he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it. If after such Reconsideration two thirds of that House shall agree to pass the Bill, it shall be sent, together with the Objections, to the other House, by which it shall likewise be reconsidered, and if approved by two thirds of that House, it shall become a Law. But in all such Cases the Votes of both Houses shall be determined by

Yeas and Nays, and the Names of the Persons voting for and against the Bill shall be entered on the Journal of each House respectively. If any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him the Same shall be a Law, in like Manner as if he had signed it, unless the Congress by their Adjournment prevent its Return, in which Case it shall not be a Law.

"Every Order, Resolution, or Vote to which the Concurrence of the Senate and House of Representatives may be necessary (except on a question of Adjournment) shall be presented to the President of the United States; and before the Same shall take Effect, shall be approved by him, or being disapproved by him, shall be repassed by two thirds of the Senate and House of Representatives, according to the Rules and Limitations prescribed in the Case of a Bill."

4. For a general discussion of the presidential veto, see Zinn, The Veto Power of the President (1951), reprinted in 12 F.R.D. 207. Mr. Zinn was and is the Law Revision Counsel of the Committee on the Judiciary of the House of Representatives.

That problem lay latent until this century was well launched. President Taft was the first chief executive to leave the continental United States while Congress was in session, but the question was still dormant in his time since no bill was sent to the White House during his absence. Prior to the occasion (in 1959) leading to the present case, the issue of how to handle bills received at the White House during a President's absence abroad arose during the tenures of Presidents Wilson, Franklin D. Roosevelt, Truman, and Eisenhower.[5] If the recent past is indeed prologue, the question cannot be dismissed as transient. The combination of increased presidential mobility and concern with foreign affairs together with prolonged congressional sessions is likely to result in a recurrent pattern of presidential travel abroad even while Congress is sitting. The problem will *doubtless endure.*

Like most of the Constitution, the simple words of the controlling clause carry the interpreter part way but do not automatically unlock all the doors. The ultimate solution must, as so often, be sought through the principles behind the language. In this instance, that policy has already been articulated by the Supreme Court. "The constitutional provisions have two fundamental purposes; (1) That the President shall have suitable opportunity to consider the bills presented to him; and (2) that the Congress shall have suitable opportunity to consider his objections to bills and on such consideration to pass them over his veto provided there are the requisite votes." Wright v. United States, 302 U.S. 583, 596, 58 S.Ct. 395, 400, 82 L.Ed. 439 (1938). See, also, Edwards v. United States, 286 U.S. 482, 486, 493, 52 S. Ct. 627, 76 L.Ed. 1239 (1932); The Pocket Veto Case, 279 U.S. 655, 677–678, 49 S.Ct. 463, 73 L.Ed. 894 (1929); La Abra Silver Mining Co. v. United States, 175 U.S. 423, 454–455, 20 S.Ct. 168, 44

L.Ed. 223 (1899). "The faithful and effective exercise of this momentous duty necessarily requires time in which the President may carefully examine and consider a bill and determine, after due deliberation, whether he should approve or disapprove it, and if he disapproves it, formulate his objections for the consideration of Congress. To that end a specified time is given, after the bill has been presented to him, in which he may examine its provisions and either approve it or return it, not approved, for reconsideration. * * * The power thus conferred upon the president cannot be narrowed or cut down by Congress, nor the time within which it is to be exercised lessened, directly or indirectly. And it is just as essential a part of the constitutional provisions, guarding against ill-considered and unwise legislation, that the President, on his part, should have the full time allowed him for determining whether he should approve or disapprove a bill, and if disapproved, for adequately formulating the objections that should be considered by Congress, as it is that Congress, on its part, should have an opportunity to re-pass the bill over his objections." The Pocket Veto Case, supra, 279 U.S. at 677–678, 49 S.Ct. at 465–466 (footnotes and citations omitted). "Where the President does not approve a bill, the plan of the Constitution is to give to the Congress the opportunity to consider his objections and to pass the bill despite his disapproval. It is for this purpose that the time limit for return is fixed. This opportunity is as important as that of the President." Wright v. United States, supra, 302 U.S. at 596, 58 S.Ct. at 401. The time limit is fixed "so that the status of measures shall not be held indefinitely in abeyance through inaction on the part of the President." Edwards v. United States, supra, 286 U.S. at 486, 52 S.Ct. at 628.[6]

---

5. As shown below, the practice during those periods has not been uniform.

6. Under these postulates, the Supreme Court has ruled that the President can approve a bill (within the eleven or twelve days) during an interim recess of the Congress (La Abra Silver Mining Co. v. United States, supra) and after

These complementary policies interact, of course, with the precise words of the Constitution. The chief linguistic key is the requirement that every bill "be *presented* to the *President*" and should be acted on within ten days (Sundays excepted) "after it shall have been *presented* to *him*" (emphasis added). The Presidency may be an institution but the President is an individual. Constitutional power is vested in his person. Certain actions he can appoint others to take for him, but he alone can approve or veto legislation; that authority cannot be delegated. Whatever the help a President may have, the ultimate decision must be his. And to decide he must have time. He is neither a rubber-stamp nor an instantaneous computer. For many bills action may be easy, but there will always be a considerable number which call for consultation, deliberation, or the gathering of information.

■ We think, too, that it is now settled that the President's constitutional power, unlike that of some governors of states, can physically be exercised anywhere. See Corwin, The President: Office and Powers (4th rev. ed. 1957), pp. 55, 281, 346–347; Miller, Some Legal Aspects of the Visit of President Wilson to Paris, 36 Harv.L.Rev. 51, 57, 60, 61, 62, 72, 76–77, 78 (1922). The District of Columbia is the seat of government (4 U.S.C. §§ 71–73), but our whole history demonstrates that the President does not lose his authority when he acts outside Washington or the White House; he can and does sign bills elsewhere, whether on official trips or working vacations. The President's official status is not even confined to the United States; many bills have been signed abroad (see findings 20–23). During his term of office the President is vested with his constitutional powers at all times and wherever he may be.[7] Although the District of Columbia is normally his post, he is free to perform his functions at the places he deems appropriate and desirable. He may go or be called anywhere in the country and he may serve abroad.[8]

■ It is also important that, under the careful words of the Constitution, the President's limited time for considering a bill does not begin until the measure is *presented* to him. That period does not mechanically commence at the end of the passage of the bill through the Congress. A further step is necessary, and the initiation of that step—presentation to the President—lies with the Congress. It has not been unknown for Congressional leaders to delay, for one or another reason, the presentation of bills to the President. See Miller, supra, 36 Harv.L.Rev. at 68, 76; Corwin, supra, pp. 281, 473–474. Conversely, the routine process of presentation can be accelerated if there be need. Always, however, the time for the President's deliberation runs from the bill's presentation to him.

From this review of the Constitution's phrasing and of the Constitution's policy there emerges a linked series of significant considerations: The President alone can approve or disapprove a bill. At any particular time, he can lawfully be at any place he deems appropriate, and

Congressional adjournment (Edwards v. United States, supra); that a "pocket veto" is effective upon the adjournment of the first session of a Congress (The Pocket Veto Case, supra); and that the President can return a bill without his approval during a 3-day recess of one House (Wright v. United States, supra).

7. The problem of disability presents different considerations and involves other constitutional texts and tests.

8. The last clause of Article I, section 5, of the Constitution seems to imply that the Houses of Congress can, by mutual consent, sit elsewhere than at the seat of Government. Section 27 of Title 2 of the U.S.Code (derived from the Act of April 3, 1794, c. 17, 1 Stat. 353) provides that when the President believes that, "from the prevalence of contagious sickness, or the existence of other circumstances", it would be "hazardous to the lives or health of the members to meet at the seat of Government," he can "convene Congress at such other place as he may judge proper."

he can lawfully take action there; in particular, it is inherent in his position that he can properly go abroad while and as President. In no case, however, does his time to evaluate a bill commence until it is presented to him. A "fundamental purpose of the constitutional provision" is "to provide appropriate opportunity for the President to consider the bills presented to him" (Edwards v. United States, supra, 286 U.S. at 493, 52 S.Ct. at 631) and the time given him by the Constitution cannot be "lessened, directly or indirectly" (The Pocket Veto Case, supra, 279 U.S. at 678, 49 S.Ct. at 466). The President, for his part, is not to be free to override the Congressional will by delaying his action beyond the stipulated time or holding a measure in suspense at his own will. Within the constitutional scheme, there is large leeway, through mutual arrangement and understanding, for the President and Congress to accommodate each other's needs and interests. But the veto provisions of the Constitution were also designed to apply in eras of hostility, coolness, partisan tactics, or simple lack of concern. If the President feels the need of the full constitutional period, Congress should not be able to diminish it, deliberately or by accident, by delivering bills in such a way that the President would not have the full eleven or twelve days for deliberation and consultation.[9] On the other hand, when Congress affirmatively desires presidential action to be prompt,[10] the President should not be able to evade or prolong the constitutional span by absenting himself or refusing to receive the measure. Neither the President nor the Congress should be free to ignore the other's interests; but neither should be dependent on the other's grace.

We believe that these factors-in-contention are best harmonized, in the spirit of the aphorism that "the Constitution is not a code of administrative procedure, but a frame of government" (United States v. Weil, 29 Ct.Cl. 523, 546 (1894)), by utilizing the instrument the Constitution has provided through its concept of "presentation"—though personal presentation to the President is not mandatory, either the Congress or the President can insist on such delivery. If personal delivery is not demanded by either side, presentation can be made in any agreed manner or in a form established by one party in which the other acquiesces; that has long been done, for normal occasions, by the continued understanding that delivery to the White House is effective presentation to the President.[11] But the right of either side to insist on personal presentation is the device-of-last-resort by which both can ultimately protect their respective interests as sanctioned by the Constitution. This primacy of the right of personal presentation is wholly fitting; it is a natural reading of the directive, that every bill shall before becoming a law "be presented to the President of the United States", that it shall be delivered to him personally (or to an immediate aide)—unless the

---

9. On the constitutional plane it is no answer that, in modern times, Presidents have established systems under which reports on bills are routinely made by interested departments and agencies, and that this process can be begun and completed without the personal initiation or even knowledge of the President (e. g., after delivery to the White House). There will always be bills for which a President feels that, despite all the aid he receives, he requires the full period for his personal consideration or consultation, or to resolve doubts. There is also no guarantee that future Presidents will maintain the current system.

10. To avoid, for instance, a pocket veto at the end of a session, or so that a bill can be put promptly into effect by repassage over a veto.

11. It is to this arrangement that the Supreme Court pointed when it referred to "presenting a bill to the President by sending it to the White House in his temporary absence. Such a presentation is familar practice. The bill is sent by a messenger and is received by the President." Wright v. United States, supra, 302 U.S. at 590, 58 S.Ct. at 398.

President is willing to receive it, and the Congress to present it, in some other fashion. See Corwin, The President, supra, p. 281.[12]

To recapitulate, we see the operation of the constitutional scheme in this way: The President can, if he wishes, insist that bills be presented to him personally by an organ designated by Congress (i. e., through its messenger or committee) wherever he may be; as a corollary, the President must make himself reasonably available to the Congressional messenger or committee if he desires a personal presentation. The President can, however, dispense with personal presentation and accept bills through some other procedure. He has the choice of a method, short of personal presentation, which he is willing to accept at any particular time; the Congress has the right to rely on and follow such a procedure established by the President until it has been informed, in some manner, that a new system has been substituted. But at any time if the Congress desires a speedier presentation, it can reject a substitute procedure established by the President and insist on personal presentation, in reasonable circumstances, and the President has to make himself available (or offer an equally speedy acceptance). Conversely, the Congress (or the presenting House) can stand on personal presentation or its equivalent (delivery to an aide in the immediate vicinity of the President), or it can establish its own system of presentation, other than personal, in which the President can acquiesce so long as he wishes. When the Congressional system becomes inconvenient or burdensome to him, the President is free to proffer his own method or to demand personal presentation (or the equivalent). In any

event, the President's time to consider the bill begins with its presentation to him under this scheme. The sum of it is that a President who desires to do so can initially determine how and when bills are to be presented to him, but his choice is always subject to be overridden by a Congress which wishes to accelerate presentation by personal delivery to the President or his immediate entourage.

■ For a President embarking on a trip abroad, there are various choices. He can, if he is adamant, demand that the Congress make personal presentation to him abroad or delay until his return. It is more likely that he will direct that bills be accepted at the White House as if he were present, or that they be forwarded by his staff for presentation to him overseas, or that they be held at the White House to await his homecoming. Presumably the last alternative will be used when the foreign journey is expected to occupy the President's full time so that consultation on legislative matters would be inconvenient or impossible. The Congress may well accede to the arrangement the President selects. But if Congress (or the presenting House) is dissatisfied with that plan and cannot induce the President to modify it, the Congress always has the option of itself sending the bill abroad and presenting it to the President (who has to make himself reasonably available for that purpose).

In this way there is full play to the overall constitutional mechanism of checks and balance as incorporated into the veto provisions. "[A]s bills multiply" (Edwards v. United States, supra, 286 U.S. at 493, 52 S.Ct. at 631) and legislative sessions lengthen, the Congress cannot forestall the President from

---

12. In the Legislative Reorganization Act of 1946, Rule XI of the Rules of the House of Representatives was amended to provide that the Committee on House Administration should present enrolled bills, "when they shall have originated in the House, to the President of the United States *in person*, and report the fact and date of such presentation to the House."

60 Stat. 812, 826 (emphasis added). The provision in the 1946 Act for the Senate Committee on Rules and Administration was the same (60 Stat. 812, 820), but apparently has since been changed. Section 106 of Title 1 of the U.S.Code directs that enrolled bills shall be "sent to the President of the United States."

enjoying the full span allowed him by the Constitution (if he wishes it) by employing a "presentation," not to *him*, but to his "home office" while he is away and otherwise occupied.[13] On the other hand, Congress can, if it wills, prevent a President—insufficiently attentive to legislative needs or desirous of unduly delaying his action on a bill —from using the device of an absence from Washington or the country as an excuse for postponing action; Congress can start the constitutional period running by seeking out the President and presenting the bill to him wherever he is. The separate action of the President and of Congress need not wait upon agreement with the other; nor can the hostility of one deprive the other of rights. Each side can take independent steps to preserve the interests granted it by the Constitution. In a time of political or ideological combat between legislative and executive, the President need not curtail trips abroad which he considers necessary out of fear that the Congress will immediately deliver to the White House bills it feels he might reject if he had the time. Congress, on the other hand, need not worry that a hostile President will unnecessarily absent himself from Washington so as to delay, for unacceptable motives of his own, his action on bills or in order to await the end of the session (with its weapon of a pocket veto).[14] The President, when he feels it important, can set the time of presentation so that it will not interfere with other activities abroad (or outside of Washington) and thus require the Congress to take affirmative action to present the bill to

him personally if it dislikes the arrangement he makes. Congress, when it desires earlier presentation, can always arrange, itself, to present the measure to the President wherever he is.[15]

We are not barred from adopting this reading of the Constitution by the history of, or the practice under, the veto provisions. As with other problems in this area, the proceedings in the constitutional and ratifying conventions are of little aid in solving the particular problem before us. Cf. The Pocket Veto Case, supra, 279 U.S. at 675, 49 S.Ct. 463; Edwards v. United States, supra, 286 U.S. at 487, 52 S.Ct. 627. Nor is the teaching of presidential practice more helpful. When the President has been in the country, the assumption of the White House staff seems to have been (at least in recent years) that delivery to the Executive Mansion necessarily constituted presentation, even though the President might be at a distant point and may have desired to postpone presentation until his return to Washington. See findings, 15, 17, 23. This assumption appears, however, to have sprouted without much testing or formal consideration. The routine method of presentation through delivery to the White House seems to have been accepted without question during presidential travels within the United States and, so far as we know, no efforts have been made at those times to limit or withdraw the authority of the legislative clerks at the White House to receive bills. This routine continuance of the regular procedure during the President's domestic travel, apparently because it did not

13. Similarly, if the Congress were meeting outside of Washington, see footnote 8, supra, the President could not return a bill without his approval by sending it to the Capitol in Washington—unless there was an arrangement or understanding to that effect.

14. To avoid pocket vetoes, Congress can also prolong its sittings until the beginning of the next session. This was done during Reconstruction days. See McKitrick, Andrew Johnson and Reconstruction (1960), pp. 12, 277, 499.

15. We have noted above that it is a postulate of the constitutional provision regarding the veto that the President shall hold himself reasonably available for personal presentation, if that would be speedier than the method he himself selects. Delivery to an authorized aide in the President's immediate entourage would undoubtedly be equivalent to personal delivery to the President.

cause any grave inconvenience, must be classed as a "precautionary practice" (United States v. Weil, supra, 29 Ct. Cl. at 548) rather than a "determinative" one (Edwards v. United States, supra, 286 U.S. at 487, 52 S.Ct. 627). "The question now raised has not been the subject of judicial decision and must be resolved not by past uncertainties, assumptions or arguments, but by the application of the controlling principles of constitutional interpretation." Wright v. United States, supra, 302 U.S. at 597–598, 58 S.Ct. at 401.

The practice during the overseas absences of Presidents Wilson, Franklin D. Roosevelt, Truman, and Eisenhower is inconclusive, but we think that it indicates, at the least, that each of those Presidents acted, at one or another time, contrary to the assumption that delivery of a bill to the White House necessarily constituted delivery to the absent President.[16] President Wilson signed four bills, of the five forwarded to him abroad, more than ten days (Sundays excepted) after their delivery to the White House. President Roosevelt vetoed one bill, and signed two, more than the constitutional period after their delivery to the White House; before one of his wartime trips he specifically informed the Vice President and the Speaker that "the White House Office will not receive bills or resolutions on behalf of the President but only for the purpose of forwarding them. As soon as received by the President their presentation to the President will have been completed in accordance with the terms of the Constitution." In addition, with respect to several bills received during President Roosevelt's absences he took pains to indicate that they had been presented to him later than the day they were received at the White House. President Truman signed four bills and vetoed one bill, and possibly three others, more than ten days (Sundays excepted) after delivery to the

White House; in his case, too, many of the bills forwarded during his absences have a notation that they were "presented to the President" on some date following that of the delivery of the bill to the White House. President Eisenhower's practice during his 1959 trip, involved here, shows that he considered the bills received during that period not to be presented to him until his return; on an earlier trip (in 1955) the White House received the bills "for forwarding to the President"; on a later trip (in 1960) bills were also received at the White House "for presentation to the President upon his return to the United States." These instances do not prove any binding custom as to the precise meaning of "presentation," but they do show that there is no positive custom or practice that delivery to the White House amounts to presentation when the President has indicated otherwise. They also show that the Presidents have not always felt bound to make arrangements with Congress as to the form of presentation. Insofar as Presidents, while abroad, have attempted to pass on many bills within the constitutional period after delivery at the White House, their actions appear (in some instances at least) to indicate "the existence of doubt and the desire to avoid controversy. See Edwards v. United States, supra, 286 U.S. at 487, 52 S.Ct. at 629.

■ For like reasons we find nothing conclusive in the Congressional treatment of bills delivered to the White House during a President's absence. Even if Congress had consistently treated such bills as presented to the President, that handling would not create a binding custom or practice in view of the different presidential treatment of such bills. Neither Congress nor the Executive, alone, can create in this area a determinative practice. But the fact is that the Congressional handling of these

16. The details of the overseas practice of these Presidents, so far as we know it, are set forth in findings 12–23. We have no information on the practice during President Kennedy's administration or whether the problem was a "live" one at that time.

measures has not been uniform. Sometimes the House has phrased its Journal or Congressional Record entries as reflecting the delivery of a bill to the White House for presentation to the President or for forwarding to the President or for the President's approval; sometimes the House phraseology indicated, as in the ordinary case, that the measure had been presented to the President. The Senate seems to have used the latter phrasing consistently. Both because the Congress cannot unilaterally establish a binding custom on this point and because the Congress has not followed a uniform policy, we conclude that there has not been "a practical construction so positive and consistent as to be determinative." Edwards v. United States, supra, 286 U.S. at 487, 52 S. Ct. at 629.

## II

■ ■ Under the principles discussed in Part I, there is no doubt that President Eisenhower's veto of H.R. 2717 was timely. He was free to decide, as he did, that during his absence bills would be received at the White House only for presentation to him upon his return to the United States. The Congress was informed of this procedure by a presidential aide before the President departed. It was also told of the change in practice via the stamps which were prepared for the bills themselves and for the receipts, on delivery of the bills to the White House. The Congress, if it did not agree, could have sent the bills to the President in Europe. But it did not take that course. Aware through its leadership of the President's new arrangement, the House sent its messenger to deliver H.R. 2717 at the White House. When it was again informed

through the stamp that presentation would be delayed until the President's return, the House took no action to accelerate presentation. By failing to take the one step which would have had that effect—sending the bill abroad through its own messenger—the House must be taken to have acquiesced in the President's new arrangement.[17]

■ Nothing turns on the mistake of the White House legislative clerk in failing to use the new stamp on H.R. 2717, and the receipt therefor, when the bill was first delivered. The clerk did not have authority to accept the bill for immediate presentation to the President; his prior authority, used while the President was in this country, had been withdrawn and new instructions issued. Congress had earlier been informed of this change. Under the new directions the clerk was powerless to accept the bill on any terms other than for presentation to the President on his return. Moreover, the mistake was corrected within three hours and the House was in no way prejudiced. It is appropriate to note, again, that "the Constitution is not a code of administrative procedure, but a frame of government." United States v. Weil, 29 Ct.Cl. 523, 546 (1894).

Similarly, it is unimportant that the House Journal and the Congressional Record indicated that H.R. 2717 was presented to the President for his approval on the day the bill was delivered to the White House. Since the House had been informed of the President's special arrangement during his absence —in general, before his departure, and with specific reference to H.R. 2717, on the same day it was delivered to the White House—the House could not uni-

---

17. Plaintiff mistakenly relies on the holding in Wright v. United States, supra, 302 U.S. 583, 58 S.Ct. 395; that the President could return a bill to the Senate, during a three-day recess of that body, by delivering it to the Secretary of the Senate. In Wright, the Secretary was "the accredited agent of the legislative body" (id. at 590, 58 S.Ct. at 398), authorized to receive such messages from the President, while the legislative clerk in the present case was neither accredited nor authorized. See Corwin, The President, supra, at p. 280; Building Commission v. Jordan, 254 Ala. 433, 48 So.2d 565 (1950); Cammack v. Harris, 234 Ky. 846, 29 S.W.2d 567 (1930).

laterally declare that the routine procedure was nevertheless effective. Moreover, the habitual wording of these entries is counter-balanced by the habitual actions of the Congress upon receipt of the veto message. The House, the originating body, recorded the vetoes (105 Cong.Rec. 19697) and took no further action. The Senate later included H.R. 2717 in a list of vetoed measures.[18]

For these reasons, we hold that plaintiff is not entitled to recover and that its petition is dismissed.

WHITAKER, Senior Judge (concurring):

I am in thorough agreement with the conclusion reached by the majority in this case, and with most that is said in justification of this conclusion. However, since there are some expressions and some inferences and some reservations in it with which I am not wholly in accord, I file this concurring opinion. For instance, I think by long-continued usage, presentation to the White House constituted presentation to the President, and that this usage could not be set aside without prior notification to the Congress. Nor do I think it was necessary for Congress to acquiesce in setting it aside. The majority opinion does not so hold, as least not explicitly.

My discussion of the question follows:

We are presented with a novel situation in this case. There are no court decisions on the question presented. The question is, what constitutes presentation to the President of a Bill passed by Congress, within the meaning of Section 7 or Article I of the Constitution, which reads:

"Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States; If he approve he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it. * * * If any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the Same shall be a Law, in like Manner as if he had signed it, unless the Congress by their Adjournment prevent its Return, in which Case it shall not be a Law."

Presentation starts the running of the 10-day period, so the question is, what constitutes presentation to the President?

The purpose of the constitutional provision is to give the President a period of 10 days (Sundays excepted) within which to consider the legislation and, within that time, to express his approval or disapproval, if he cares to do so. Since a full 10 days (Sundays excepted) are allotted to him for consideration, it would seem to follow, necessarily, that he might require that the Bill be presented to him in person, in order that he might have the full time.[19] My conclusion in this case is based on that premise.

Having that prerogative, it would seem also to follow that, in case he did not desire personal presentation, he had the right to determine the way in which substitute presentation should be made, provided only that this was not more onerous than personal presentation. His determination of the manner of presentation, of course, had to be communicated to Congress, so that that body might comply with its duty to present Bills to the President for his consideration.

---

18. See "Presidential Vetos: List of Bills Vetoed and Action Taken Thereon by the Senate and House of Representatives, First Congress through the Eighty-Sixth Congress, 1789–1961" (G.P.O. 1961).

19. Edwards v. United States, 286 U.S. 482, 152 S.Ct. 627, 76 L.Ed. 1239 (1932).

Having the right to prescribe the way in which presentation should be made in the first instance, he had the right to change the way from time to time, but, again, he was required to notify Congress of any change, in order that Congress might discharge its constitutional duty.

In the absence of formal notification to Congress of the substitute for personal service, established usage would seem to determine the method of presentation.[20]

Presentation by Congress in the way prescribed marks the beginning of the 10-day period.

These propositions would seem to be fundamental and should guide us to a proper solution of the question presented in this case.

For at least 40 years, no doubt for a much longer time, enrolled Bills have not been presented to the President in person, except in the case of the Bank Holiday Bill of 1933 and Bills passed on the eve of *sine die* adjournment of the Congress. The usage has been for the Committee on Administration of either the House or the Senate, after the Bill has been signed by the Speaker of the House and the Presiding Officer of the Senate, to send a clerk to the White House with the enrolled Bill and deliver it to a legislative clerk in the records office of the White House, who signs a receipt for it. The Committee on Administration then reports to the House or Senate "that this day they presented to the President of the United States, for his approval, the following Bills."

For many years this has been understood to constitute presentation to the President. Usage requires us to hold that it complies with the constitutional requirement for presentation to the President, unless in the instance of any particular Bill, including the particular Bill here under consideration, action was taken by the President to notify Congress that some other mode of presentation would be required, either personal presentation or otherwise.

Before he left the country on August 26, 1959, the President gave adequate notice to Congress that delivery of enrolled Bills to the White House would not constitute presentation of such legislation to him. H.R. 2717, the Bill involved in this case, was one of the Bills delivered during that period.

This was the second occasion on which President Eisenhower had considered the problem of presentation to him of enrolled Bills during his absence from the United States. Before he departed for the Geneva Conference on July 15, 1955, he had asked the advice of Attorney General Brownell on the proper handling of Bills passed by both Houses of Congress while he was away. The Attorney General had suggested that arrangements be made with Congress so that enrolled Bills would be held until his return or delivered to the White House "for forwarding to the President." The findings do not show whether the President, or his representative, discussed the matter with Congress, but they do show that all Bills delivered to the White House during this time were stamped "Received for forwarding to the President."

Prior to his departure on August 25, 1959, President Eisenhower instructed his staff of stamp all Bills delivered to the White House during his absence: "Held for presentation to the President upon his return to the United States." This decision was informally communicated to congressional leaders, at the President's direction, by his Deputy Assistant for Congressional Affairs.

Since the President had the right to require personal presentation to him, he had the right to notify Congress that during his absence the accustomed substitute would not be acceptable.

When he advised Congress that delivery of Bills to the White House would not be deemed presentation to the President, President Eisenhower followed the

20. The Pocket Veto Case, 279 U.S. 655, 689, 49 S.Ct. 463, 73 L.Ed. 894 (1929).

example of his predecessors. For example, when President Franklin D. Roosevelt was preparing to leave the country for an extended stay in 1943, he requested advice from his Attorney General as to the proper handling of Bills passed by Congress. The Attorney General advised him in part:

"The practice of receiving bills at the White House and forwarding them for presentation may also require a measure of cooperation. Probably the custom of treating delivery to the White House as presentation to the President should be negatived by informal Presidential advice to the Vice-President and the Speaker that persons at the White House will, during a given period, be authorized only to forward, and not to receive on behalf of the President, enrolled bills. Such directions should be reflected in the reports of the Committee on Enrollment to their respective Houses announcing the date of presentation of bills to the President."

In rendering this advice, Attorney General Biddle adverted to a practice during President Wilson's administration of varying the form of the report of presentation in the Congressional Record, when the President was outside of the country, notifying the originating House that the Bill had been delivered to the White House, instead of to the President.

Upon receipt of this advice, President Roosevelt sent a memorandum to the Vice President and the Speaker of the House of Representatives, reading as follows:

"As I expect to be away from Washington for some time in the near future, I hope that insofar as possible the transmission of completed legislation be delayed until my return. The White House Office, however, in other cases of emergency has been authorized to forward to me any and all enrolled bills or joint resolutions. They will be forwarded at once by the quickest means. The White House Office will not receive bills or resolutions on behalf of the President but only for the purpose of forwarding them. As soon as received by the President their presentation to the President will have been completed in accordance with the terms of the Constitution. *I suggest, therefore, that if any bill is forwarded to the White House, the entries on the House and Senate Journals show 'delivery to the White House for forwarding to the President'.*

"For security reasons I hope that this can be kept confidential for as long as is necessary." [Emphasis in original.]

Since the President had the right to require personal presentation, President Roosevelt was fully justified in notifying Congress that the customary usage of treating delivery to the White House as presentation to the President would not be followed, and in prescribing a different procedure during his absence from the country. The essential element of notification to Congress of the change was fully complied with. Had this been omitted, I think the change in procedure would have been ineffectual.

President Truman, who succeeded to the Presidency upon Mr. Roosevelt's death, did not, prior to his departure for the Potsdam Conference in 1945, take action similar to that of his predecessor in his memorandum to leaders of Congress. Nonetheless, President Truman acted on a number of Bills more than 10 days (Sundays excepted) after delivery to the White House but within 10 days (Sundays excepted) after his return. He may have done so with the understanding that the procedure to be followed during the President's absence, as set out in President Roosevelt's 1943 memorandum, would continue in force during his administration. The Roosevelt memorandum, however, seems to relate only to the particular absence then in contemplation and does not ap-

pear to have been intended to apply to any others. But the reasons for the procedure there prescribed would seem to be equally applicable to an absence of any future President, quite as much as to Mr. Roosevelt. In any event, it is clear that President Truman did not regard presentation to a clerk at the White House while he was absent from the country as presentation to him. The Congress appears to have been of the same opinion, for it gave the same treatment to Bills that Mr. Truman purported to veto as it did to all other vetoed legislation. They were referred back to Committee; Congress took no further action upon them, and they were not published as laws.

The record does not show that the procedure during the Truman administration was based on formal notification to Congress that the custom of treating presentation to the White House as presentation to the President would not be followed during his absence; however, we need not concern ourselves with this for it is indisputable that, with regard to the Bill presently before us, President Eisenhower advised Congress that, during his absence from the country, delivery to the White House would not be considered presentation to the President, and that, if Bills were delivered to the White House, they would be stamped, "Held for presentation to the President upon his return to the United States."

After that notification was given, H.R. 2717, the Bill here in question, was delivered to the White House on August 31, 1959. The President returned it to the House in which it originated on September 14, 1959, with his objections to it. He had returned to the United States on September 7, 1959.

No action was taken by Congress to present the Bill to the President other than delivery of it to the White House. But the President had notified Congress that he would not accept this as the equivalent of personal delivery to him. Since he had the right to insist on presentation to him in person, it must be

held that it was not "presented to the President" prior to his return to this country on September 7, 1959. He vetoed it within 10 days thereafter. In my opinion it never became law.